**STATE of Minnesota, Respondent,**

v.

**Brandon D. COX, Appellant.**

**No. A08–145.**

Supreme Court of Minnesota.

March 18, 2010.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, David C. Brown, Assistant Hennepin County Attorney, Minneapolis, MN, for respondent.

Theodora Gaïtas, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

ANDERSON, PAUL H., Justice.

Brandon D. Cox was convicted in Hennepin County District Court of first-degree felony murder, Minn.Stat. §§ 609.185(a)(3), 609.05 (2008), and felon in possession of a firearm, Minn.Stat. § 624.713, subd. 1(2), 2(b) (2008) (renumbered in 2008; previously designated as subdivision 1(b)), in connection with the shooting death of James Moody. In this appeal, Cox argues that the admission at trial of grand jury testimony of a potential State witness who expressed reluctance to testify at trial, was released from a subpoena, and did not testify at trial, violated his confrontation rights under the United States Constitution. We conclude that admission of the testimony was constitutional error, that the error was not harmless beyond a reasonable doubt, and that retrial does not violate the Double Jeopardy Clause. Therefore we reverse Cox's convictions and remand for a new trial.

In the early morning of February 4, 2007, at approximately 3:45 a.m., a Rainbow Taxi driver and his customer saw a Suburban, Green and White Taxi with all four doors open parked in front of an apartment building complex in Brooklyn Center, Minnesota. As the Rainbow Taxi passed the Green and White taxi, the customer thought he saw someone lying on the ground near the Green and White taxi. Believing that it was necessary to investigate the situation right away, the driver turned his taxi around and pulled into the parking lot. Upon further investigation, the driver and his customer found the driver of the Green and White Taxi slumped out to the side of his taxi, and that taxi's engine was running. The Green and White driver was later identified as James Moody. Following their initial investigation, the Rainbow driver entered the passenger side of Moody's cab to activate the emergency button while the customer called 911.

*The Investigation*

The police arrived at the scene within approximately five minutes. It was immediately apparent that Moody was dead. The police secured the area, called officers at the crime lab, and notified the medical examiner. Other responding officers canvassed the apartment complex, looking for potential witnesses. The crime lab technician who investigated the crime scene col-

lected three discharged cartridge casings, two from the front passenger's seat area and one from the ground near Moody's body.

The medical examiner arrived shortly before 6:00 a.m. The examiner initially noted that the right side of Moody's face was on the pavement, his right foot was on the running board, his left foot was just underneath the running board, his right arm was tucked underneath the body, and his left arm was dangling to the side. During the autopsy, the examiner found three gunshot wounds. One bullet entered Moody's upper back, went through the junction of the vena cava and the right side of the heart, and lodged in the sternum. A second bullet entered his right flank and exited the left side of the abdomen. A third bullet took a sharp downward angle through the left side of Moody's upper abdomen and eventually lodged in the right buttock. The examiner noted that the injuries to Moody's face were typical of a sudden collapse in death onto a hard surface. The examiner also found $126 in Moody's wallet.

Meanwhile, Brooklyn Center police detective Garrett Flesland contacted the Green and White Taxi company and obtained the telephone number of the party who requested a taxi with a pickup address at the location of the homicide. Green and White told the detective that Moody accepted the fare at 3:10 a.m. and started his cab's meter at 3:24 a.m. Green and White said that typically, a taxi cab meter is turned on when a passenger enters the taxi. The driver of the Rainbow taxi pushed the emergency button in Moody's taxi at 3:53 a.m.

Using a law enforcement database, the police determined that the telephone number obtained from Green and White was assigned to a Qwest Wireless subscriber with a billing address in Omaha, Nebraska. Detective Flesland called that telephone number, and the call went immediately to voice mail. Flesland then identified himself as a police detective, asked that whoever received his message contact him as soon as possible, and provided his personal cell phone number.

The police also learned that earlier during the morning of February 4, the same Quest Wireless telephone number was used to summon a taxi cab from Blue & White Taxi. Blue & White employees told the police that the man who called using that number had asked to be picked up at Brunswick Zone, a bowling alley in Brooklyn Park. Blue & White dispatched a taxi to Brunswick Zone at 12:25 a.m. The police then obtained a surveillance video from Brunswick Zone covering a time frame from 7:00 p.m. on Saturday through about 2:00 a.m. on Sunday.

Just after 3:00 p.m. on February 4, Detective Flesland was contacted by D.L., a resident of the Brooklyn Center apartment building complex. Flesland went to D.L.'s apartment where he met with D.L. and S.T., a resident in another building in the complex. Flesland initially interviewed S.T. in his squad car and then at the police department. During the interview, he obtained S.T.'s consent to search her apartment. When the police executed a search warrant on S.T.'s apartment, they found a black handgun, some clothing, and two cell phones.

At some point, Detective Flesland showed S.T. the surveillance video from Brunswick Zone, which showed the appellant, Brandon D. Cox, and his brother Willen McIntyre walking through the bowling alley's main lobby entrance around midnight. S.T. identified the two men and told Flesland that she had spent the evening with the two men shown in the video. Flesland, in an effort to find another gun and a cell phone, then directed a search of the area between the apartment

complex and a nearby pharmacy, including dumpsters and garbage cans.

By Monday, February 5, the police had begun to focus on Cox as a suspect. They ran various database checks that listed his home address in Omaha. The police also traced the serial number from the black handgun found in S.T.'s apartment and learned that the gun had been purchased by McIntyre's stepfather, who was in the Navy and stationed overseas at the time of the investigation. The police made contact with McIntyre's stepfather, who stated that his gun should have been in the family's home in Blaine. During a subsequent search of the McIntyre family home, the police found an empty gun holster but no gun.

On Tuesday, February 6, at 5:15 p.m., the police executed a search warrant at the Brooklyn Park home of Cox's father. They found Cox inside the home and placed him under arrest. Following his arrest, Cox agreed to talk with Detective Flesland. When asked, Cox identified his home address as being in Omaha, Nebraska. He said that he lived at that address with his mother and two brothers. He admitted that he, McIntyre and S.T. took a taxi cab from Brunswick Zone to S.T.'s apartment complex. Cox said he went to the apartment of another resident, S.W., to get a DVD player and returned to S.T.'s apartment where he stayed for the rest of the night, along with McIntyre and S.T. Cox admitted that the cell phone with service localized to the Omaha area which was found in S.T.'s apartment belonged to him. The police could not identify the source of the second cell phone.

During their investigation, the police had the discharged cartridge casings collected from the crime scene and bullets recovered from Moody's body analyzed by a forensics firearms and tool marks examiner. This investigation revealed that the cartridge casing found on the ground near Moody's body had been fired from the gun recovered from S.T.'s apartment. The bullet recovered from Moody's buttock had a caliber and rifling pattern similar to the gun recovered from S.T.'s apartment but there were insufficient individual characteristics on the bullet to make a positive identification. The casings recovered inside Moody's cab were not fired from the gun found in S.T.'s apartment, although both casings had been fired using the same gun. The police never recovered the gun that fired these casings.

On February 22, 2007, a Hennepin County grand jury indicted Cox on charges of first-degree murder, Minn.Stat. § 609.185(a)(3) (intentional killing in the course of an aggravated robbery), and Minn.Stat. § 609.05 (aiding and abetting an intentional killing in the course of an aggravated robbery); second-degree murder, Minn.Stat. § 609.19, subd. 1(1) (2008) (intentional killing), and Minn.Stat. § 609.05 (aiding and abetting an intentional killing); and felon in possession of a firearm, Minn.Stat. § 624.713, subd. 1(2), 2(b).

*Cox's Trial*

Cox's jury trial began on November 5, 2007. The State presented the evidence obtained by the police crime scene investigators, the forensic analysis of this evidence, and the evidence recovered in the search of S.T.'s apartment. The State also presented Cox's statements to the police. The Blue & White taxi cab driver testified about picking up a woman and two men at the Brunswick Zone in the early morning on February 4, 2007. The driver said he was acquainted with the woman, S.T., but did not know either of the men. The passengers asked to be driven to S.T.'s apartment complex. Because of his concern that he would not be paid, the driver asked for payment of the fare in advance. One of the men became angry and said,

"[T]hat is why they be shooting the other cab driver then." S.T. paid the fare, and all three passengers were dropped off at S.T.'s apartment complex.

Midway through the trial, the State moved to admit S.T.'s grand jury testimony as substantive evidence against Cox. The State advised the district court that it was making this request because S.T., who had been subpoenaed to testify, was afraid to testify as a result of threatening statements made to her. The court ordered an evidentiary hearing to determine whether Cox had waived his right to confront S.T. The hearing was held in a closed courtroom and out of the presence of the jury.

At the evidentiary hearing, the State introduced an audio tape from an October 27, 2007, telephone call made by Cox from the Hennepin County jail to R.J., the mother of Cox's child. During the conversation, Cox gave R.J. the address to S.T.'s apartment, and asked her to get directions to that address using MapQuest. At one point during the conversation, Cox said, "You gotta f--k with . . ." but did not finish his statement.

Cox testified at the evidentiary hearing and stated that he asked R.J. to look up S.T.'s address because he did not trust his attorney. He said he suspected his attorney was lying to him about S.T.'s address, and specifically, about her availability to testify. Two days after receiving Cox's call, R.J. and Cox's mother visited Cox at the jail. Jail records confirm the visit, but there is no evidence regarding what was said during the visit.

S.T. also testified at the evidentiary hearing. According to S.T., at some point after testifying before the grand jury, she moved to a new address. The State subsequently provided S.T.'s new address to Cox's attorney. S.T. testified that on October 25, 2007, she received a letter from Cox at her new address, instructing her to call someone. S.T. stated that she did not

feel threatened by the letter. Two days after receiving the letter, S.T. said that she was approached by R.J. and Cox's mother in the parking lot of her new residence. S.T. testified that both R.J. and Cox's mother were in tears and that Cox's mother told her that Cox was "not going to be able to do the time." She said they were "basically asking me not to testify." S.T. also recalled R.J. saying that Cox cannot be without his kids, and, "He's not about to do this time." According to S.T., Cox's mother said that she would "do whatever she had to do." S.T. testified that R.J. and Cox's mother stood about 5 feet away from her during the conversation. During the hearing, Cox's attorney and the State provided statements from R.J. and Cox's mother in which both women denied ever visiting S.T. at her home.

S.T. told the district court that following this visit, she was concerned for her safety and the safety of her child, and that she believed testifying at Cox's trial would put her in danger. The court asked S.T. whether she took anything said by R.J. or Cox's mother as a threat, and S.T. responded that "[i]t's not just—you can simply ask somebody something like that, but to actually come to somebody's house and tell that somebody is not about to do it, is a threat to me." S.T. added:

> So by telling me he's not about to do this time, it's basically telling me that with or without you he is not about to do this time. So you have a choice, and if I don't make the right choice, then they not coming out saying what the possibility of something happening, but that's just how I took it.

The district court then discussed with S.T. the possibility of holding her in contempt if she did not testify, including the potential of S.T. going to jail. S.T. responded, "It's not my thing that I just don't feel [like] testifying. It's really a

simple fact that I don't feel safe testifying." S.T. also stated that the encounter with R.J. and Cox's mother was the only reason she did not want to testify. At the end of the State's direct examination of S.T., the State asked S.T., "If the judge says today that he wants you to testify in front of this jury, will you testify?" S.T. responded, "I don't want to." The State then said to S.T., "I know you don't want to. If the court ordered you to, would you testify or would you not?" S.T. responded, "I don't know."

Following the hearing, the district court issued a written order granting the State's motion to introduce S.T.'s grand jury testimony and released S.T. from the subpoena to testify at Cox's trial. The court determined that the State had proved that Cox forfeited his confrontation rights and that S.T.'s grand jury testimony was admissible under the "catch-all" hearsay exception, see Minn. R. Evid. 807. In its findings of fact, the court characterized S.T.'s disposition as "extreme reluctance ... to testify." The court found that even though "there was never an explicit threat to her, [S.T.] was clearly distressed by the situation and appeared to be legitimately in fear." The court also noted that S.T. "would likely not testify before a jury because she fears that, in the event she testified at the trial of Defendant, either she and/or her child will be harmed." Although the court recognized that "there is a possibility that [S.T.] would appear and be somewhat responsive to questions," the court found that "[S.T.] would be very reluctant to testify on any point, and likely less than forthcoming in the knowledge of the events of the weekend of February 3–5, 2007."

In its order, the district court declared S.T. unavailable to testify "as a practical and legal matter." Further, the court found S.T.'s grand jury testimony credible and concluded that Cox had engaged in wrongful conduct—"singl[ing] out [S.T.] ... specifically because of her importance as a witness against him"—that was "the proximate cause of [S.T.'s] unavailability at trial."

*Grand Jury Testimony*

When Cox's trial resumed, S.T.'s grand jury testimony was read to the jury. In her testimony, S.T. said that in February 2007 she lived alone in her Brooklyn Center apartment. At that point, she had known Cox for six years. Sometime on a Saturday night in February 2007, Cox and S.T. called a taxi to take them to a nearby bowling alley. McIntyre joined them at the bowling alley. When the three of them decided to leave, Cox called another taxi. During the ride, the driver, whom S.T. knew as Larry, said he needed the fare before dropping them off. S.T. recalled Cox becoming angry but did not remember what was said. S.T. paid the fare, and the driver dropped them off at S.T.'s apartment complex. After watching a movie and eating pizza, S.T. fell asleep.

S.T. testified that she woke up to the sound of Cox shutting the door to her apartment. Cox asked if she had heard any gun shots, and S.T. said no. S.T. then overheard a conversation between McIntyre and Cox. S.T. testified that Cox said "something about the cab driver grabbing his gun" and "something about [Cox] shooting [the cab driver] twice." S.T. also testified that McIntyre admitted "he shot him once." S.T. also overheard Cox say that the driver was going to give him the money.

S.T. further testified that when she looked out her window she saw a taxi cab "just sitting there." She later heard a dog barking and saw flashing lights in the street. She testified that Cox was pacing back and forth, and talking in an "amped up" way with McIntyre. Cox told S.T. that he was scared and that he had thrown

up. At some point, S.T. lay down but could not sleep, while Cox and McIntyre remained in the apartment. Later in the morning, the police knocked on S.T.'s door, but S.T. said she did not answer because Cox told her not to. Cox told S.T. to call a neighbor to ask "what the police do when they come in your house." After that, S.T. saw Cox and McIntyre "emptying their guns." S.T. said that one of the guns was black and the other one was black and silver.

Shortly after emptying their guns, Cox and McIntyre left S.T.'s apartment. Cox told McIntyre to leave first and to call Cox from the pharmacy across the street. Before leaving, Cox asked S.T. for money, and she gave him some cash. S.T. did not know Cox's telephone number, but Cox gave her McIntyre's telephone number before leaving. Ten minutes after Cox left the apartment, S.T. called McIntyre, who said that he and Cox were in a car. S.T. said that after this call, she had no further contact with Cox or McIntyre. S.T. also testified that the clothes seized in her apartment belonged to Cox, that she did not recognize the gun found in her apartment, and that no guns other than those belonging to Cox and McIntyre would have been in her apartment. Following the submission of S.T.'s grand jury testimony, the State rested its case.

The jury found Cox guilty on all counts. The district court entered judgment of conviction for first-degree murder and for being a felon in possession of a firearm. Cox was sentenced to the mandatory term of life in prison for first-degree murder together with a 60–month concurrent sentence for the firearms offense. Cox appealed his convictions to our court. Cox argues on appeal that the State failed to prove first, that S.T. was unavailable; second, that he forfeited, through wrongful conduct, his right to confront S.T. at his trial; and finally, that the admission of S.T.'s prior unconfronted testimony was error warranting reversal of his convictions.

## I.

Appellate courts review de novo the surrounding circumstances relevant to a Sixth Amendment determination. *State v. Fields*, 679 N.W.2d 341, 345 (Minn.2004) (citing *Lilly v. Virginia*, 527 U.S. 116, 136–37, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999)). The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. The Minnesota Constitution contains nearly identical language. *See* Minn. Const. art. I, § 6.

*Confrontation Right and Forfeiture by Wrongdoing*

The Confrontation Clause bars the admission of out-of-court testimonial statements unless the witness is unavailable and the defendant had a prior opportunity to examine the witness. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In *Crawford* the United States Supreme Court said, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68–69, 124 S.Ct. 1354. There is a narrow exception to the confrontation right, referred to as forfeiture by wrongdoing, which "extinguishes confrontation claims on essentially equitable grounds...." *Id.* at 62, 124 S.Ct. 1354 (citing *Reynolds v. United States*, 98 U.S. 145, 158–59, 25 L.Ed. 244 (1879)). The forfeiture-by-wrongdoing exception is aimed at defendants who intentionally interfere with the judicial process. The Supreme Court has said that "[W]hen

defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce." *Davis v. Washington*, 547 U.S. 813, 833, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). The Court has also said that "[w]hile defendants have no duty to assist the State in proving their guilt, they *do* have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system." *Id.*

The Supreme Court first addressed the forfeiture-by-wrongdoing exception in *Reynolds*, a case about deliberate witness tampering. The federal prosecutor presented evidence that George Reynolds, who was charged with bigamy, had deliberately kept his second wife away from the family home when a deputy sought to serve her with a subpoena. *Reynolds*, 98 U.S. at 148–50. When the deputy twice attempted to locate Reynolds' second wife to deliver the subpoena, Reynolds refused to disclose her location. *Id.* By the time of trial, the prosecution had still not succeeded in locating Reynolds' second wife. *Id.* Because of the second wife's unavailability, the district court allowed the prosecution to introduce testimony of Reynolds' second wife from Reynolds' earlier trial. *See id.* The Supreme Court affirmed, holding that admission of the prior statements did not violate Reynolds' right to confront witnesses at trial. *Id.* at 158. The Court held that when a witness is absent by the defendant's "own wrongful procurement," the defendant "is in no condition to assert that his constitutional rights have been violated" if the witness's "evidence is supplied in some lawful way." *Id.* at 158.

The Supreme Court recently analyzed the forfeiture-by-wrongdoing exception at length in *Giles v. California*, —— U.S. ——, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008). Dwayne Giles was charged with first-degree murder in the shooting death of his ex-girlfriend. *Id.* at ——, 128 S.Ct. at 2681. At Giles' trial, the district court allowed the State to introduce statements that the victim had made to a police officer responding to a domestic-violence report approximately three weeks before the homicide. *Id.* at ——, 128 S.Ct. at 2681. The California Supreme Court affirmed Giles' conviction, holding that the defendant had forfeited his right to confront the victim because he had committed the murder for which he was on trial, and it was his intentional criminal act that made the victim unavailable to testify. *Id.* at ——, 128 S.Ct. at 2682 (citing *People v. Giles*, 40 Cal.4th 833, 55 Cal.Rptr.3d 133, 152 P.3d 433, 435 (2007)). The Court granted Giles' writ of certiorari and reversed, stating that the State must prove that "the defendant has in mind the particular purpose of making the witness unavailable." *Id.* at ——, 128 S.Ct. at 2687–88 (citations omitted) (internal quotation marks omitted). Because the California state courts had not considered Giles' intent, having found intent irrelevant to the forfeiture exception, the Court remanded for further proceedings. *Id.* at ——, 128 S.Ct. at 2693.

■ Applying the foregoing principles to this case, it is evident and undisputed that S.T.'s grand jury testimony was both testimonial and unconfronted. *See Crawford*, 541 U.S. at 68, 124 S.Ct. 1354 (holding that grand jury testimony is testimonial). Therefore, this case turns on the applicability of the forfeiture-by-wrongdoing exception. As a practical matter, after *Giles*, the forfeiture-by-wrongdoing exception requires the State to prove (1) that the declarant-witness is unavailable, (2) that the defendant engaged in wrongful conduct, (3) that the wrongful conduct procured the unavailability of the witness and (4) that the defendant intended to procure the unavailability of the witness. *See Giles*, —— U.S. ——, 128 S.Ct. at

2687–88; *id.* at ——, 128 S.Ct. at 2694–95 (Souter, J., concurring); *Fields,* 679 N.W.2d at 347; *State v. Wright (Wright III),* 726 N.W.2d 464, 480 (Minn.2007).[1] We have assumed that the preponderance of the evidence standard of proof applies to the State's burden of proof. *Wright III,* 726 N.W.2d at 479 n. 7.

### Unavailability of Witness

■ As stated above, the State must prove that the declarant-witness is unavailable to avail itself of the forfeiture-by-wrongdoing exception. A witness is not "unavailable" for Confrontation Clause purposes "unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Barber v. Page,* 390 U.S. 719, 724–725, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968). The Supreme Court has said that "[t]he lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." *Ohio v. Roberts,* 448 U.S. 56, 74, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (citation omitted) (internal quotation marks omitted), *abrogated on other grounds by Crawford,* 541 U.S. at 68, 124 S.Ct. 1354. The Court went on to sound a note of caution by saying "[b]ut if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation." *Roberts,* 448 U.S. at 74, 100 S.Ct. 2531. The State "bears the burden of establishing this predicate." *Id.* at 75, 100 S.Ct. 2531.

Here, while S.T. had concerns about testifying, she did respond to the State's subpoena to testify at Cox's trial. At the evidentiary hearing conducted in a closed courtroom, S.T. explained her hesitation about testifying. When asked if she would testify under court order, she said, "I don't know." But the State never actually called S.T. as a witness at Cox's trial, nor did it establish that S.T. would refuse to testify if she were called as a witness.

Based on the record in this case, we conclude that the State failed to establish by a preponderance of the evidence that S.T. was unavailable to testify at Cox's trial for purposes of the Confrontation Clause. Because the State did not establish the unavailability predicate of the forfeiture-of-confrontation-rights test, the forfeiture-by-wrongdoing exception does not apply and we therefore conclude that the admission of S.T.'s grand jury testimony violated Cox's rights under the Confrontation Clause. Consequently, we hold that the district court erred when it admitted S.T.'s testimony.

■ We have held that Confrontation Clause violations are subject to a constitutional harmless-error-impact analysis. *State v. Caulfield,* 722 N.W.2d 304, 314 (Minn.2006). For an error of constitutional dimension to be deemed harmless, "it must be harmless beyond a reasonable doubt." *State v. Courtney,* 696 N.W.2d 73, 79 (Minn.2005) (citing *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). We have said "[a]n error is harmless beyond a reasonable doubt if the guilty verdict actually rendered was 'surely unattributable' to the error." *Courtney,* 696 N.W.2d at 80 (quoting *State v. Juarez,* 572 N.W.2d 286, 292 (Minn.1997)). The State does not claim that admission of S.T.'s unconfronted grand jury testimony was harmless; and our independent review of the record satisfies us that the error was not harmless beyond a reasonable doubt. Therefore, we

---

1. *See also* Tom Lininger, *The Sound of Silence: Holding Batterers Accountable for Silencing Their Victims,* 87 Tex. L. Rev. 857, 893 (2009) (noting that after *Giles,* courts need to address questions as to witness unavailability, wrongful act, causation and specific intent to silence the witness).

hold that this error was not harmless. Accordingly, Cox's convictions must be reversed and the matter remanded for a new trial.

## II.

By a pro se supplemental brief, Cox asserts that the State's evidence was legally insufficient to support the jury's verdict of aiding and abetting felony murder, as required by Minn.Stat. §§ 609.185(a)(3) and 609.05. Specifically, Cox claims that evidence of the underlying felony was lacking. The Double Jeopardy Clause precludes retrial where a conviction is set aside because the evidence supporting it is legally insufficient. *Tibbs v. Florida*, 457 U.S. 31, 40–41, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Legally insufficient "'means that the government's case was so lacking that it should not have even been submitted to the jury.'" *Id.* at 41, 102 S.Ct. 2211 (emphasis omitted) (quoting *Burks v. United States*, 437 U.S. 1, 16, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978)). A reviewing court considers all of the evidence admitted by the trial court, whether erroneously admitted or not, in deciding whether retrial is permissible under the Double Jeopardy Clause. *Lockhart v. Nelson*, 488 U.S. 33, 34, 41–42, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988). Here, in view of all the evidence presented by the State, including erroneously-admitted evidence, we conclude that the evidence implicating Cox in an attempted robbery of Moody was legally sufficient, and therefore the Double Jeopardy Clause does not preclude a retrial.

Reversed and remanded for a new trial.