# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00175-CR

**Ali Khalid Mohsin, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 277TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 21-0258-K277, THE HONORABLE STACEY MATHEWS, JUDGE PRESIDING

## O P I N I O N

Appellant Ali Khalid Mohsin was convicted by a jury of aggravated assault with a deadly weapon causing serious bodily injury to a family or household member and sentenced to fifty years' confinement. *See* Tex. Penal Code § 22.02(a)(1), (b)(1)(A). On appeal, Mohsin contends that: (1) the trial court abused its discretion by granting the State's motion for forfeiture by wrongdoing; (2) the court, "in applying [the rule of forfeiture by wrongdoing] to both testimonial statements and inadmissible hearsay, prejudiced [him] to the extent that the judgment should be reversed"; and (3) the court abused its discretion by denying his application for writ of attachment. We affirm the trial court's judgment of conviction.

## BACKGROUND

In the early morning of January 23, 2021, Mohsin brought his wife, Yasmeen Wadiwalla, to Ascension Seton Northwest Hospital in Austin. She had three facial fractures and

required surgery on her jaw, which had to be wired shut. Throughout the week following her admission, she offered changing accounts for the cause of her injuries, variously explaining that Mohsin had ambushed her outside her apartment and punched her in the face, that she had tripped and fallen, or that she could not remember what had happened. In a sworn written statement made on January 27th, she attested, "[My] friend dropped me off at my apartment. While I was walking to the door[,] I looked around and saw Ali approach me. All I can remember was him saying where were you. After that I blacked out then just remember being in the grass, then his car."

Officers arrested Mohsin on February 9th. He was originally indicted for aggravated assault causing serious bodily injury; however, the charge was amended in a reindictment on February 10, 2022, to allege that he had used or exhibited a deadly weapon and that Wadiwalla was a person with whom he had or had had a dating relationship. On October 4, 2021, Wadiwalla signed a "Release of Obligation," stating that she no longer wished to pursue the charge against Mohsin, that she had fallen on a sidewalk after having had too much to drink, and that she did not want Mohsin "to be falsely charged with a felony when [she did not] remember what happened."

Wadiwalla was served with a subpoena by the State twice[1] in advance of trial: by email on February 17, 2022, and in person at her apartment on March 7, 2022. Wadiwalla informed the State on multiple occasions that she would not cooperate with its investigation,

---

[1] Under the Texas Code of Criminal Procedure, a subpoena may summon a person to appear "before a court to testify in a criminal action . . . on a specified day." Tex. Code Crim. Proc. art. 24.01(a)(1). A subpoena may be served by various means, including delivering a copy of it to the witness or "electronically transmitting a copy of the subpoena, acknowledgment of receipt requested, to the last known electronic address of the witness." *Id.* art. 24.04(a).

appear at trial, or testify. Likewise, on recorded jail calls with Mohsin, she complained of the State's persistence in attempting to secure her presence at trial, stated that she would rather go to jail for a year than testify, and told him that she was not going to return to her apartment but was going to stay with friends. Anticipating that she either would not appear or would appear and recant her sworn statement, which according to the State would render her testimony false—and arguing that such a recantation would render her "unavailable"—the State filed a "Brief on the Defendant's Sixth Amendment Right to Confrontation Forfeited by Wrongdoing,"[2] requesting that the trial court admit Wadiwalla's out-of-court statements at trial.

A hearing was held on the State's request, at which the State offered testimony from Williamson County Sheriff's Office Investigator Pete Hughey, who reviewed jail calls between Mohsin and Wadiwalla. He testified that Mohsin "d[id] not want the victim to appear in court for trial" and had advised her to file an affidavit of non-prosecution and not to appear. Noting that there had been approximately 2,400 jail calls between Mohsin and Wadiwalla since Mohsin's arrest approximately a year earlier—of which one or two were initiated by her and many of which she did not answer—Hughey testified about the contents of a sample of fourteen.

In the calls, there was an "ongoing, 'Well, [Wadiwalla was] driving [Mohsin's] car, so [she] better not show up for court,' 'If [she] want[ed] to show up for court, [he was] going to take the car.'" He repeatedly blamed her for his being in jail and pleaded that she "do something, start something up, stir some shit up, not go to court." He said that he did not "give a fuck about her" and did not care what happened to her; he "essentially does whatever [he] feels like doing to her at that moment."

---

[2] The trial court subsequently treated the State's filing as a motion for forfeiture by wrongdoing.

3

Mohsin told her what to tell the State "as far as guilt and innocence on [him]." He also told her that she would go to jail if she contradicted her statement in the release of obligation, reminded her that his father was "paying her money or giving her things," and assured her that his father would "take care of her" and pay the $500 fine if she refused to appear in response to the subpoena. On the final call, recorded on March 18, 2022, she informed Mohsin that she was going to stay at a friend's house "until this is all fucking over."

Hughey testified that he had heard "many calls where [Mohsin]'s telling her they can't do anything to you, he's practically shouting it over the phone trying to drill it in her head and manipulate her into believing that she cannot be picked up on a subpoena." He further testified that in domestic-violence cases, the abuser often has "some sort of control over [the victim] while he's in jail" and that after listening to the jail calls in this case, he believed that Mohsin "still has that control" over Wadiwalla. On a call with Hughey on February 17, 2022, she stated: "Do not bother me anymore, I'm done, I've signed the affidavit, I'm not appearing, y'all are harassing me, stop." At the time of that call, Hughey testified, an officer had not yet been to her apartment.

In addition, Hughey testified regarding the contents of messages—admitted at the hearing—sent between Mohsin and Wadiwalla through a service that Mohsin could access via a kiosk in the jail. Mohsin cautioned Wadiwalla not to speak with anyone from the District Attorney's Office and assured her that she could not be arrested and brought to court if she failed to appear under the subpoena.

Hughey also testified about his interaction with Wadiwalla when he served her the second subpoena approximately two weeks before the hearing. She told him that she was not going to cooperate and indicated that "even if she comes, nobody can make her say anything."

4

She said that "she knew the law and that . . . she wasn't going to answer questions."  He suggested to the trial court that "she could still show up and not cooperate, or she could just not show up at all for trial."

Lastly, Hughey testified concerning the history of abuse in Mohsin and Wadiwalla's relationship.  The trial court admitted a 2018 judgment in which Mohsin was placed on deferred adjudication for 12 months for assaulting her.  Officers had responded to "a lot of calls" involving the couple, particularly in the lead up to the charged offense when "there w[ere] multiple calls over a span of about seven days where officers had to appear at their home."[3]  Many of the calls were for harassment because Mohsin "wouldn't leave her alone."  Moreover, while Wadiwalla called police on other occasions to report that she had been assaulted, "when the cops appeared and start[ed] talking to her, she decided not to go forward[,] and she didn't want to press charges."  Hughey testified that there were also allegations that Mohsin had stabbed her in the leg, an act for which a contemporaneous audio recording made by their young daughter exists[4] and which she mentioned in a forensic interview; slashed or let the air out of Wadiwalla's father's tires; and broken into her apartment "by throwing some sort of object against the window."  Hughey testified that "[t]here are countless times [Mohsin] has shown up

---

[3]  Hughey elsewhere referred to "her apartment" or "[t]he apartment that [he] found her in."

[4]  Aside from Hughey's brief testimony, the stabbing was not referenced during the guilt-innocence phase of trial.  After the trial court expressed concern about admitting evidence of the stabbing, the State advised the court that it was "not trying to get the stabbing in," to which the court responded, "Very good, because you knew you weren't going to get it in."  During the punishment phase, the audio recording—in which Mohsin acknowledged stabbing "this dude" twice—was admitted, as was a jail call in which Wadiwalla stated that she had forgiven him for "stabbing [her]."  She testified during the sentencing hearing that Mohsin was referring to her as "dude" on the recording and that she did not remember her jail-call statement.

5

at her different apartments, at her parents' house, trying to break into her parents' home while she's staying there."

Defense counsel argued that Mohsin's contact with Wadiwalla did not amount to "coercion or intimidation or threats." He characterized the communications as "ordinary husband-and-wife type interactions" and proposed that Mohsin was not "coercive" or "forceful" but merely "suggestive" and possibly "[m]anipulative." Counsel explained, "[Mohsin] wants this case dismissed. He doesn't want to go to trial, and he wants his wife to assist him. Can that be construed as something untoward? Perhaps." Nevertheless, counsel concluded, Mohsin's actions did not merit depriving him of his right to confrontation.

The trial court delayed its ruling until it could review the parties' briefing. Two days later, prior to the start of jury selection on the day for which Wadiwalla had been subpoenaed, the court announced its conditional ruling: she would be found to be available and required to testify if she appeared, but if she did not appear, "she's unavailable, and her statement will come in."

Following jury selection, the trial court noted that Wadiwalla had not appeared and appointed her an attorney "to make sure that she's protected in case she does appear" and "to make sure that she has somebody that she can speak with that's not a party in the matter." The State asked whether the court had granted its motion for forfeiture by wrongdoing, and the trial judge stated that she had.

On the first day of trial, Monday, March 28, 2022, defense counsel filed an application for a writ of attachment of Wadiwalla. In his supporting affidavit, counsel averred that she was a material witness because she had made several exculpatory statements and had signed the release of obligation stating that she did not remember what had caused her injuries.

6

Before the start of trial, the attorney appointed for Wadiwalla informed the trial court of her efforts over the weekend to secure Wadiwalla's presence. She explained that she had contacted Wadiwalla, who had been "very receptive to a meeting"; that a meeting had been scheduled for Saturday; that Wadiwalla had not attended; and that the attorney had offered Wadiwalla additional times for a meeting but had not received a response. After the attorney had given her account, the trial court denied Mohsin's application for a writ of attachment.

Following the trial and a hearing on punishment at which Wadiwalla appeared and testified in support of Mohsin, he was convicted and sentenced to fifty years' confinement. This appeal followed.

## DISCUSSION

### I. Forfeiture by Wrongdoing

In his first two issues, Mohsin contends that the trial court abused its discretion by granting the State's motion for forfeiture by wrongdoing and that the error "prejudiced [him] to the extent that the judgment should be reversed."[5]

Under the Sixth Amendment, a criminal defendant has the right to be confronted with the witnesses against him. U.S. Const. amend. VI; *Pointer v. Texas*, 380 U.S. 400, 406 (1965) (applying Sixth Amendment to states). The Amendment "contemplates that a witness who makes testimonial statements admitted against a defendant will ordinarily be present at trial for cross-examination, and that if the witness is unavailable, his prior testimony will be introduced only if the defendant had a prior opportunity to cross-examine him." *Giles v. California*, 554 U.S. 353, 358 (2008) (citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004)).

---

[5] Because Mohsin's second issue is the harm analysis for his first, we will consider the issues together.

The Confrontation Clause is, however, subject to certain "equitable exceptions," including the rule of forfeiture by wrongdoing, a doctrine of estoppel that allows for the admission of out-of-court statements over both confrontation and hearsay objections. *Colone v. State*, 573 S.W.3d 249, 264–65 (Tex. Crim. App. 2019); *Gonzalez v. State*, 195 S.W.3d 114, 116–17 (Tex. Crim. App. 2006). "Rules of estoppel will bar relief even for a trial court ruling that violates a mandatory provision in a statute and may even bar relief on what would otherwise be an absolute requirement." *Colone*, 573 S.W.3d at 265. The rule is codified in article 38.49 of the Texas Code of Criminal Procedure, which provides in relevant part:

> (a) A party to a criminal case who wrongfully procures the unavailability of a witness or prospective witness:
>
> > (1) may not benefit from the wrongdoing by depriving the trier of fact of relevant evidence and testimony; and
> >
> > (2) forfeits the party's right to object to the admissibility of evidence or statements based on the unavailability of the witness as provided by this article through forfeiture by wrongdoing.
>
> (b) Evidence and statements related to a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of a witness or prospective witness are admissible and may be used by the offering party to make a showing of forfeiture by wrongdoing.

Tex. Code Crim. Proc. art. 38.49(a)–(b).

A trial court determines whether the rule applies by a preponderance of the evidence at a hearing outside the jury's presence. *Id.* art. 38.49(c). Where the State is the party seeking to admit the evidence or statements, it must prove: "(1) that the declarant-witness is unavailable, (2) that the defendant engaged in wrongful conduct, (3) that the wrongful conduct

8

procured the unavailability of the witness[,] and (4) that the defendant intended to procure the unavailability of the witness." *Brown v. State*, 618 S.W.3d 352, 355 (Tex. Crim. App. 2021) (quoting *State v. Cox*, 779 N.W.2d 844, 851 (Minn. 2010)). The State is not required to show that the defendant's *sole* intent was wrongfully to cause the witness's unavailability, that the defendant's actions constituted a criminal offense, or that any offered statements are reliable. Tex. Code Crim. Proc. art. 38.49(d).

In *Brown*, the Court of Criminal Appeals surveyed other states' approaches to the rule of forfeiture by wrongdoing and favorably quoted the New Mexico Supreme Court's conclusion:

> [T]he interest in disclosing relevant information at trial is paramount . . . . [A]ny significant interference with that interest beyond the exercise of legal rights provided the defendant by the trial or constitution may constitute wrongful conduct. Various forms of manipulation may satisfy that condition, and it may often be the case that the nature of the conduct is less important than the effect of the conduct on the witness's willingness or ability to testify at trial.

618 S.W.3d at 356 (internal quotation marks omitted) (quoting *State v. Maestas*, 412 P.3d 79, 88 (N.M. 2018)). With respect to the causation requirement, the Court of Criminal Appeals noted that courts seem to be more "restrictive" but "have recognized that procurement or causation need not be proven directly" and may instead by established by inference. *Id.* at 356–57.

The Court also recognized the heightened relevance of the rule in cases involving domestic violence:

> Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the

crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.

*Id.* at 356 (quoting *Giles*, 554 U.S. at 377); *see Davis v. Washington*, 547 U.S. 813, 832–33 (2006) ("This particular type of crime is notoriously susceptible to intimidation or coercion of the victim to ensure that she does not testify at trial."); *Powell v. State*, No. 02-19-00206-CR, 2021 WL 5370163, at \*72 (Tex. App.—Fort Worth Nov. 18, 2021, pet. ref'd) (mem. op. on reh'g, not designated for publication) ("[T]he domestic-violence context is particularly suitable for the application of the forfeiture by wrongdoing doctrine."). Nevertheless, although "domestic violence conduct may sometimes be relevant to determining whether particular conduct was designed to prevent a witness from testifying," "the standards for finding forfeiture by wrongdoing do not change because a case involves domestic violence." *Brown*, 618 S.W.3d at 355–56.

We review a trial court's decision to apply the rule of forfeiture by wrongdoing for an abuse of discretion. *See Colone*, 573 S.W.3d at 263–64 (applying abuse-of-discretion standard); *Gonzalez*, 195 S.W.3d at 126 (characterizing admission of out-of-court statements under rule as "an evidentiary ruling"). An abuse of discretion does not occur unless the trial court acts "arbitrarily or unreasonably" or "without reference to any guiding rules and principles." *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). In other words, we may not reverse the trial court's ruling unless the "decision falls outside the zone of reasonable disagreement."

10

*Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016); *see Henley v. State*, 493 S.W.3d 77, 83 (Tex. Crim. App. 2016).

An evidentiary ruling—such as the one admitting Wadiwalla's out-of-court statements—"will be upheld on appeal if it is correct on any theory of law that finds support in the record." *Gonzalez*, 195 S.W.3d at 125–26. Both direct and circumstantial evidence may be used to establish that a defendant's wrongful conduct caused a witness's unavailability. *See Brown*, 618 S.W.3d at 357 (noting that "courts have recognized that procurement or causation need not be proven directly, but may be established by inference" and approving of statement that "'[i]n cases involving long-term domestic relationships, various factors may support an inference that wrongdoing has caused unavailability'" (quoting *Maestas*, 412 P.3d at 90–91)). In an article 38.49 hearing, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony and the evidence. *See* Tex. Code Crim. Proc. art. 38.49(b), (c); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). When, as here, the trial court does not issue findings of fact, we review the evidence in the light most favorable to the trial court's ruling and assume that the court made findings that are supported by the record. *See Brown*, 618 S.W.3d at 357; *Shepherd v. State*, 489 S.W.3d 559, 572–73 (Tex. App.—Texarkana 2016, pet. ref'd).

Mohsin raises three arguments in support of his contention that the trial court abused its discretion by granting the State's motion for forfeiture by wrongdoing: (1) Wadiwalla was not "unavailable," (2) he did not engage in "wrongful conduct," and (3) his conduct did not cause Wadiwalla's unavailability. *See Brown*, 618 S.W.3d at 355.

11

## A.      Unavailability

Mohsin argues that Wadiwalla was not unavailable because the State "failed to make a good-faith effort to obtain her presence at trial." *See Hardy v. Cross*, 565 U.S. 65, 69 (2011) ("[A] witness is not 'unavailable' for purposes of the . . . confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." (quoting *Barber v. Page*, 390 U.S. 719, 724–25 (1968))). Specifically, he appears to assert that the State should have sought to compel her presence through a writ of attachment.

"The trial court's determination of whether the effort to procure attendance or testimony of the absent witness is sufficient is reviewed under the abuse of discretion standard." *Ledbetter v. State*, 49 S.W.3d 588, 592 (Tex. App.—Amarillo 2001, pet. ref'd) (citing *Mancusi v. Stubbs*, 408 U.S. 204, 212–13 (1972)); *see Reed v. State*, 312 S.W.3d 682, 685 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." *Hardy*, 565 U.S. at 70. It is always possible to think of additional steps that the State might have taken to secure a witness's presence, but "the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." *Id.* at 71–72. A prosecutor is not required to take actions if there exists a "great improbability that such efforts would have resulted in locating the witness[] and would have led to her production at trial." *Id.* at 70. "The State is not required to engage in clearly futile activities before a trial court can, in its discretion, determine that the State made good-faith efforts to produce a witness at trial." *Ledbetter*, 49 S.W.3d at 594. The State's failure to request a writ of attachment is merely "one factor for the trial court to consider in determining whether the State made a good-faith effort." *Id.*

12

We cannot say that the trial court abused its discretion by concluding that the State made a good-faith effort to secure Wadiwalla's presence at trial. She was served by subpoena twice, including in person on March 7, 2022—approximately three weeks before the start of trial. *See id.* (noting that prosecutor told witness several weeks before trial that his testimony was necessary and that subpoena was served on witness more than three weeks before trial). When Investigator Hughey served Wadiwalla at her house, she did not answer the door, appeared only after her daughter went to get her, and stated that she was not going to cooperate or testify. Hughey testified at the forfeiture-by-wrongdoing hearing that Wadiwalla did not appear to have a job, that she was usually at her or her father's house, and that she told Mohsin on a jail call that she intended to stay at a friend's house "until this is all fucking over." On calls and through kiosk messages, Mohsin repeatedly warned her not to appear in court or testify, promised that his father would pay the fine for her failing to respond to the subpoena, and threatened to call Child Protective Services (CPS) or have his father take her car if she appeared. In response to this coercion, she filed an affidavit of non-prosecution and stated on jail calls that she would "rather go to jail for a year for saying nothing than give [Mohsin] like 15 years," that she told an investigator that she did not "want anything to do with the situation anymore," and that she hung up on a prosecutor who had called.

Indeed, the State was persistent enough that Wadiwalla characterized investigators' and prosecutors' efforts to secure her presence as "harassment," exclaiming on another jail call, "[L]iterally what they've been doing has been like harassing me, coming to my apartment, harassing [my daughter], when [she] was trying to go to the store. She literally had to come back inside. And then talking to me in my apartment. I told them email me the subpoena. Like, I don't care. I told you guys I'm over this shit. Coming to my apartment. Coming to my

13

neighbors'. Like, they need to fuck off." Because of these efforts, Wadiwalla stated on the call that she was "never going back to [her] apartment again" and was "going to go stay with [her] friends." Similarly, Hughey testified that on a phone call with him on February 25, 2022, Wadiwalla stated, "Do not bother me anymore, I'm done, I've signed the affidavit, I'm not appearing, y'all are harassing me, stop."

Considering Mohsin's threats and Wadiwalla's many assertions that she would not appear at trial, would not testify, and intended to stay with friends and not return to her apartment, the trial court could have reasonably concluded that any further attempts to contact her would have been futile and counterproductive. *See Byrd v. State*, No. 07-20-00234-CR, 2022 WL 2719060, at *6 (Tex. App.—Amarillo July 13, 2022, pet. ref'd) (mem. op., not designated for publication) (concluding that trial court did not abuse its discretion in ruling witness was unavailable where, among its efforts, State sought to contact witness through his counsel, who told them witness did not want to be "snitch"); *Sanchez v. State*, No. 13-22-00512-CR, 2024 WL 377855, at *3 (Tex. App.—Corpus Christi–Edinburg Feb. 1, 2024, no pet. h.) (mem. op., not designated for publication) ("There is no requirement that the State take futile steps to secure an uncooperative witness's presence for the doctrine to apply."). At a minimum, the State's exertions "far exceed[ed] mere issuance of subpoenas," *see Reed*, 312 S.W.3d at 686, and "the failure to request issuance of an attachment was not a conclusive factor," *Ledbetter*, 49 S.W.3d at 594. From this record, we conclude that the trial court did not abuse its discretion by finding that the State made a good-faith effort to secure Wadiwalla's presence at trial. *Mancusi*, 408 U.S. at 212–13; *Ledbetter*, 49 S.W.3d at 592; *Reed*, 312 S.W.3d at 685.

14

**B.      Wrongful Conduct**

Mohsin next argues that his conduct was not wrongful for purposes of article 38.49.  Although the Court of Criminal Appeals has not defined "wrongful conduct," it has—as noted above—quoted language from the New Mexico Supreme Court recognizing that any "significant interference" with the interest in disclosing relevant information at trial "beyond the exercise of legal rights provided the defendant by the trial or constitution" may amount to wrongful conduct.  *Brown*, 618 S.W.3d at 356 (quoting *Maestas*, 412 P.3d at 88).  The conduct's nature is less important than its effect on a prospective witness, but "[v]arious forms of manipulation" may suffice.  *Id.*  We find persuasive our sister courts' view of conduct falling within the statute's ambit.  Wrongful conduct need not be violent or explicitly threaten physical harm, for example it may also include intimidation, harassment, offering a bribe, encouraging or pressuring an individual not to testify, leveraging financial dependence, threatening to report a prospective witness to CPS, or instructing a witness on how to avoid service.  *See Stapp v. State*, No. 06-23-00016-CR, 2023 WL 5424764, at *6 (Tex. App.—Texarkana Aug. 23, 2023, no pet.) (mem. op., not designated for publication) (suggesting defendant would provide financial assistance and asking for complainant's help "in dealing with the charges"); *Byrd*, 2022 WL 2719060, at *7 (bribing witness); *McGee v. State*, No. 05-17-01445-CR, 2019 WL 2004059, at *7–8 (Tex. App.—Dallas May 7, 2019, no pet.) (mem. op., not designated for publication) (listing various types of wrongful conduct); *Espinoza v. State*, No. 05-17-00547-CR, 2018 WL 6716619, at *13 (Tex. App.—Dallas Dec. 21, 2018, no pet.) (mem. op., not designated for publication) ("repeatedly encourag[ing] and/or cajol[ing witness] to avoid trial"); *Pena v. State*, No. 03-08-00546-CR, 2009 WL 2900742, at *7 (Tex. App.—Austin Sept. 9, 2009, no pet.) (mem. op., not designated for publication) (threatening to report complainant to CPS).  "A direct

threat or demand from the defendant to the witness to avoid service or not appear in court is not required. What is required is that the defendant procured the witness's absence through wrongdoing." *McGee*, 2019 WL 2004059, at *7.

The record before us is replete with evidence that Mohsin engaged in wrongful conduct to prevent Wadiwalla's testimony. Despite cautioning that "the past commission of family-violence assaults" alone is insufficient to establish causation under the rule of forfeiture by wrongdoing, the Court of Criminal Appeals has acknowledged that "domestic violence conduct may sometimes be relevant to determining whether particular conduct was designed to prevent a witness from testifying." *Brown*, 618 S.W.3d at 358; *see Davis*, 547 U.S. at 832–33 (noting that family-violence crimes are "notoriously susceptible to intimidation or coercion of the victim to ensure that she does not testify at trial").

The evidence reflects an extensive history of abuse and harassment by Mohsin against Wadiwalla. He was placed on deferred adjudication for 12 months in 2018 for assaulting her. Investigator Hughey testified that there was also an allegation that Mohsin had stabbed her in the leg, that Hughey had heard Wadiwalla's daughter's recording of the stabbing, that the daughter mentioned the stabbing in a forensic interview, and that a police report was made regarding another incident in which Mohsin broke into Wadiwalla's apartment by throwing an object through the window. He further testified that officers had responded to numerous calls in which she reported that Mohsin had physically assaulted or harassed her, that she would decline to press charges when police arrived, that Mohsin had slashed or deflated her father's tires, and that Mohsin had tried to break into her parents' house while she was staying with them. Hughey also testified that Mohsin said that he did not "give a fuck about her" and that he did not care what happened to her; Mohsin "essentially does whatever [he] feels like doing to her at that

16

moment." Wadiwalla told an officer at the hospital that Mohsin would search her phone to see if she was talking to other men, that he "only does things" when she goes out or ignores him, that he would punch or grab her during arguments, and that he had stolen her phone and broken it.

Against this backdrop of abuse and manipulation, Mohsin, while incarcerated, engaged in a persistent and concerted campaign of intimidation, coercion, bribery, and threats, attempting—over 2,400 calls and dozens of kiosk messages—to secure Wadiwalla's absence from trial. He repeatedly threatened to have his father take Mohsin's car from her if she appeared to testify and warned that she would go to jail if she came to court in the car. Explaining that this meant that she "cannot even come to this—near this county anymore," Mohsin added, "I scratch my back; you scratch my back. Remember?" Alternatively, he reassured her that if she did not testify, his father would "g[e]t [her] with whatever will be," "help" her, "take care of everything for [her]," and give her money. She acknowledged at one point that she had received $100 from Mohsin's father.

Elsewhere, Mohsin warned that if she testified, he would "tell them all the shit and make [CPS] be invo[]lved and maybe m[artial] law," their son would hate and resent her, and Mohsin would "call around make sure [a] report will be done [he] got a[ ]lot [of] friends and [he] can send holly da some good info too so don[']t make [him]." He also warned that, because Wadiwalla had signed the release of obligation, she would be prosecuted and jailed if she testified against him. He advised her that "[t]he lawyer told [him] that the only thing [his] wife can tell them now since she signed the non-prosecution—she can't be against [him] anymore because she can get in trouble . . . . She just has to testify on [his] behalf and say that [he is] innocent."

17

Consequently, while Mohsin is correct that he did not threaten Wadiwalla with physical harm or directly prevent the State from learning of her whereabouts, his conduct nevertheless constituted wrongdoing under article 38.49. Unlike *Brown*, this is not a case in which, aside from past instances of family violence, the State "has not offered evidence that the defendant issued any threats or engaged in conduct otherwise designed to control" a witness. *Brown*, 618 S.W.3d at 358–59. In *Brown*, the State did not "point to any conduct toward the victim that would suggest an attempt to discourage or prevent her from testifying," and there was no evidence that the defendant tried to influence the complainant "to decide not to show up for court." *Id.* Here, by contrast, there was evidence of Mohsin's efforts to threaten, coerce, and influence Wadiwalla and to discourage her from testifying.

### C.   Causation

Third, Mohsin argues that "any alleged misconduct" did not cause Wadiwalla's unavailability and that "it is apparent that [she] had either reconciled or simply no longer wanted to press charges."

In its survey of state interpretations of the rule of forfeiture by wrongdoing in *Brown*, the Court of Criminal Appeals quoted decisions from the high courts of New Mexico and New York, which concluded that "indirect and attenuated consequences will not satisfy the causation condition for purposes of forfeiture," *id.* at 356 (quoting *Maestas*, 412 P.3d at 90); that "something more like a 'precipitating and substantial' cause may be required, and even a determination that the wrongful conduct was 'the real reason' for unavailability," *id.* at 357 (quoting *Maestas*, 412 P.3d at 90); that it is "not enough that the defendant expressed hope that the witness would not testify against him at trial," *id.* (quoting *People v Smart*, 12 N.E.3d 1061,

18

1067 (N.Y. 2014)); and that "misconduct must have been 'a significant cause of the witness's decision not to testify," *id.* (quoting *Smart*, 12 N.E.3d at 1067). The Court noted, however, that courts "have recognized that procurement or causation need not be proven directly, but may be established by inference" and that "[i]n cases involving long-term domestic relationships, various factors may support an inference that wrongdoing has caused unavailability." *Id.* (quoting *Maestas*, 412 P.3d at 90–91).

As discussed above, the facts of this case are distinguishable from those of *Brown*, in which the Court of Criminal Appeals held that the past commission of family-violence-assault offenses alone is insufficient to prove causation where the State otherwise failed to show any conduct intended to control or influence the witness, there was no "logical connection" between the defendant's conduct and the witness's refusal to speak with law enforcement, and the State "did not point to any act by [defendant] that might have motivated" the witness's conduct. *Id.* at 358–59. In the context of Mohsin's extensive history of domestic violence, he pleaded for Wadiwalla not to cooperate with investigators; pressured her to sign an affidavit of non-prosecution; erroneously assured her that she could not be arrested or made to testify; told her to insist on his innocence to police and the trial judge; offered her financial incentives not to appear at trial; and threatened to report her to CPS, turn their son against her, and have his father take Mohsin's car from her if she appeared. Throughout the jail calls and kiosk messages, Mohsin alternated professions of his love with insults, demeaning language, and accusations of infidelity. *Bullock v. State*, --- S.W.3d ---, ---, No. 01-22-00076-CR, 2023 WL 8939274, at *4 (Tex. App.—Houston [1st Dist.] Dec. 28, 2023, no pet. h.) ("The record reflects evidence of an abusive cycle in their communications. Often the subject of the same email chain changes from everyday issues, like coparenting and insurance, to Bullock threatening and

19

harassing Michelle."). He stated that he did not "give a fuck about her" and that he did not care what happened to her. He "essentially d[id] whatever [he] fe[lt] like doing to her at that moment." He also violated the provision of the trial court's emergency protection order prohibiting him from communicating with Wadiwalla, including by repeatedly meeting with her in person in violation of jail rules.[6]

Although Mohsin asserts that Wadiwalla's "decision to not attend the [trial] was one made from an independent desire to no longer proceed with the prosecution and arguably from an independent wish to reconcile with [him]," the trial court was the sole trier of fact and judge of credibility at the article 38.49 hearing, and, to the extent the record supports alternative inferences regarding her unavailability to testify at trial, we must defer to the trial court's resolution of any conflicting inferences. *See Brown*, 618 S.W.3d at 355, 358; *Guzman*, 955 S.W.2d at 89; *Shepherd*, 489 S.W.3d at 572–73. Viewing the record in the light most favorable to the trial court's ruling, we conclude that the trial court did not abuse its discretion by granting the State's motion for forfeiture by wrongdoing. Because the trial court did not err, we need not address Mohsin's second issue, concerning harm. *See* Tex. R. App. P. 47.1; *Garza v. State*, 7 S.W.3d 164, 165 (Tex. Crim. App. 1999). We overrule his first issue.

---

[6] Following the hearing on the motion for forfeiture by wrongdoing, the State became aware that Mohsin and Wadiwalla had arranged an in-person visit at the jail for 8 p.m. that night. On the State's request, jail personnel prevented the visitation. The next day, the trial judge explained that she had spoken with a jail official, who had informed her that the jail had a policy of "no visitation ever with the complaining witness" and that Wadiwalla "should have never been ever allowed to visit." During defense counsel's closing argument at the hearing, he stated that Wadiwalla had visited Mohsin at the jail "at least seven times" in the preceding five months.

## II. Writ of Attachment

In his third issue, Mohsin contends that the trial court abused its discretion by denying his application for a writ of attachment. He argues that Wadiwalla was a material witness because she had made various statements that he did not assault her and that because she did not appear for trial, he "was deprived of any witnesses who could testify to the true nature and details surrounding the alleged offense."

Article 24.12 of the Texas Code of Criminal Procedure provides:

> When a witness who resides in the county of the prosecution has been duly served with a subpoena to appear and testify in any criminal action or proceeding fails to so appear, the attorney representing the state or the defendant may request that the court issue an attachment for the witness. The request must be filed with the clerk of the court and must include an affidavit of the attorney representing the state or the defendant, as applicable, stating that the affiant has good reason to believe, and does believe, that the witness is a material witness.

Tex. Code Crim. Proc. art. 24.12.[7] A writ of attachment commands a peace officer "to take the body of a witness and bring him before such court, magistrate or grand jury on a day named, or forthwith, to testify [o]n behalf of the State or of the defendant, as the case may be." *Id.* art. 24.11. For purposes of the statute, "a subpoena filed by the State inures also to the benefit of the defendant . . . . If a witness is served and fails to appear, either side is entitled to a writ of attachment." *Erwin v. State*, 729 S.W.2d 709, 713 (Tex. Crim. App. 1987), *superseded by statute on other grounds as recognized by Burks v. State*, 876 S.W.2d 877, 904 (Tex. Crim. App. 1994).

---

[7] Although both the United States and Texas Constitutions provide that a criminal defendant has the right to compel the attendance of witnesses at trial, Mohsin does not raise a constitutional claim. *See* U.S. Const. amend. VI; Tex. Const. art. I, § 10.

In 2017, article 24.111 of the Code of Criminal Procedure was amended to require a hearing to be held before issuance of a writ of attachment and to permit the trial judge to issue an attachment only if she determines that issuance is "in the best interest of justice." Tex. Code Crim. Proc. art. 24.111(b); *see* Act of April 5, 2017, 85th Leg., R.S., ch. 292, § 3, art. 24.111, 2017 Tex. Gen. Laws 541, 542. In making the best-interest determination, the trial court must consider the affidavit supporting the request for the writ of attachment and appoint an attorney to represent the witness at the hearing. Tex. Code Crim. Proc. art. 24.111(c), (d).

Although "best interest of justice" is not defined in the Code, the term "interests of justice" has been defined as both the "proper view of what is fair and right in a matter in which the decision-maker has been granted discretion," *Interests of Justice*, Black's Law Dictionary (11th ed. 2019), and "a judge's discretion to make a ruling in the interests of fairness and equity in a particular situation depending on the facts," *Ex parte Pointer*, 492 S.W.3d 318, 320 (Tex. Crim. App. 2016) (concerning appointment of counsel for indigent habeas applicants).

As the State correctly points out, Mohsin does not address the "best interest of justice" or article 24.111 in his brief. Although the trial court did not make an explicit finding with respect to its best-interest determination, we may infer the finding from its ruling. *See Chadwick v. State*, 309 S.W.3d 558, 561 (Tex. Crim. App. 2010) ("[W]e will imply any findings of fact supported by the evidence and necessary to support the trial judge's ruling when the judge failed to make explicit findings." (citing *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007))).

Further, the record supports a determination that granting Mohsin's request for a writ of attachment would not have been in the best interest of justice. As examined above, Mohsin spent much of the time following his arrest attempting to procure Wadiwalla's absence

22

from trial through threats, intimidation, and manipulation. His statements on jail calls with her reflect a belief that were she not to testify at trial, the charge against him would be dropped, and he would be released. Only after the trial court granted the State's motion for forfeiture by wrongdoing and ruled that Wadiwalla's statements would be admissible despite her unavailability did he file the writ application. In light of the abusive dynamics evident in their relationship and his repeated endeavors to influence her statements to law enforcement and prosecutors, allowing him to compel her presence at trial would have undermined the court's forfeiture ruling and created, at a minimum, a risk of tampering and perjury. Indeed, the trial court—apparently recognizing that risk—had earlier stated that were Wadiwalla to appear and testify that she could not remember what had happened to cause her injuries, she could be "deemed unavailable." For these reasons, the trial court did not abuse its discretion by denying Mohsin's application for a writ of attachment. We therefore overrule his third issue.

## CONCLUSION

Having overruled or not reached each of Mohsin's issues, we affirm the trial court's judgment of conviction.

_____
Edward Smith, Justice

Before Justices Baker, Kelly, and Smith

Affirmed

Filed: April 30, 2024

23