STATE OF MINNESOTA

IN SUPREME COURT

A21-1101

Court of Appeals                                                              Thissen, J.
                                                                  Dissenting, Anderson, J.
                                                               Took no part, Procaccini J.

State of Minnesota,

                        Appellant,

vs.                                                                  Filed:  May 8, 2024
                                                               Office of Appellate Courts

Anthony James Trifiletti,

                        Respondent.

_____

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Thomas R. Ragatz, Assistant Ramsey County
Attorney, Saint Paul, Minnesota, for appellant.

Cathryn Middlebrook, Chief Appellate Public Defender, Anders J. Erickson, Assistant
State Public Defender, Saint Paul, Minnesota, for respondent.

Travis J. Smith, Murray County Attorney, William C. Lundy, Assistant Murray County
Attorney, Slayton, Minnesota; and

Jonathan P. Schmidt, Adam E. Petras, Assistant Hennepin County Attorneys, Minneapolis,
Minnesota, for amicus curiae Minnesota County Attorneys Association.

_____

1. Because the State failed to establish that a witness would not have been available to testify in person at some reasonable point in time during the trial, the district court erred in determining that a witness against the defendant was unavailable under the Confrontation Clause of the Sixth Amendment to the United States Constitution and Article I, Section 6, of the Minnesota Constitution.

2. The defendant did not invite the district court's error in determining that a witness against him was unavailable under the Confrontation Clause of the Sixth Amendment to the United States Constitution and Article I, Section 6, of the Minnesota Constitution.

3. The district court's error in determining that a witness was unavailable under the Confrontation Clause was harmless beyond a reasonable doubt.

Reversed.

O P I N I O N

THISSEN, Justice.

Respondent Anthony James Trifiletti was convicted of second-degree unintentional felony murder. His first trial ended in a mistrial after the jury deadlocked. At the time of the second trial, one of the State's witnesses was exposed to COVID-19. The district court determined that the witness was unavailable and allowed the transcript of her testimony from the first trial to be read into the record in lieu of live testimony. The question before us is whether the district court's decision violated Trifiletti's right to confrontation

guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 6, of the Minnesota Constitution.

## FACTS

Anthony James Trifiletti fatally shot Douglas Lewis on May 1, 2020. Before the shooting, Trifiletti and Lewis were involved in aggressive driving on Interstate 94. The front of Lewis's car came into contact with the back of Trifiletti's truck. Trifiletti and Lewis exited the highway and parked on Burns Avenue in Saint Paul. Trifiletti's friends, who were driving in a separate vehicle and saw the cars make contact, followed Trifiletti off the highway and parked nearby. Trifiletti's friends then walked over to Trifiletti's truck. Trifiletti testified to being upset his truck was damaged and he and his friends testified that Lewis also appeared to be upset.

Trifiletti called his father to explain that he had been in an accident, he was not injured, and there was some damage to his truck. Trifiletti seemed calm during the call. Trifiletti then approached Lewis and asked for his insurance information. Lewis replied that Trifiletti should be the one to give Lewis his "f-ing insurance information." Trifiletti stepped back and walked to the front of Lewis's vehicle to take photos of it. Trifiletti returned to his truck to speak with his friends. They noticed Lewis speaking on his phone.

When Lewis got off the phone, Trifiletti approached Lewis again and asked for his insurance information. One of Trifiletti's friends testified that around that time he saw Lewis in his vehicle, thought Lewis was going to drive away, and heard Trifiletti say "hey" in a loud voice. Lewis exited his vehicle and he and Trifiletti got into a verbal altercation.

3

Multiple witnesses testified that at some point Lewis returned to his vehicle and "rummaged" inside. Trifiletti assumed Lewis was getting his insurance information.

Trifiletti and one of his friends testified that during the course of the incident Lewis repeated the phrase "I am GD" and reached for his waist, which they interpreted as threats. Trifiletti and two of his friends testified that they believed Lewis had a gun. Trifiletti and all three of his friends testified, however, that they did not see Lewis with a firearm. At varying times, Trifiletti's friends headed back to their vehicle. One of Trifiletti's friends said that Trifiletti told them to "get out of here"—Trifiletti stated he no longer felt the situation was safe.

Photographic evidence showed that, at some point during the encounter, Lewis's car had moved several feet forward. There was also evidence that Lewis's car was running after the shooting.

Trifiletti called his father again. Trifiletti's father testified that during the second call Trifiletti was upset, told him that Lewis had a gun, and said, "this guy's going to shoot me," and "this guy's going to kill me." Trifiletti's father further testified that soon thereafter he heard gunshots through the phone.[1]

Early the following morning, Trifiletti made a statement to law enforcement officers about the events. In his statement, Trifiletti told police that at some point after he and

---

[1]    Later in the evening, Trifiletti's father went to the St. Paul Police Department to check on Trifiletti and provide information to the police. He was not allowed inside due to COVID-19 restrictions, but he did speak to a police officer via intercom. The police officer testified at trial that Trifiletti's father told him that Trifiletti was driving during the first phone call and that he was running during the second phone call. At trial, Trifiletti's father denied that he made those statements to the officer.

Lewis exited Interstate 94 and initially got out of their cars on Burns Avenue, Trifiletti was in his truck, Lewis was in his car, and both started driving forward. Almost immediately thereafter, Lewis parked his car and got out, and Trifiletti also exited his truck. Trifiletti further stated that he returned to his truck a second time before the shooting but that he decided not to drive away because he was afraid Lewis might shoot him as he did so. Trifiletti said that he saw Lewis come toward him and then he shot Lewis three to four times. Trifiletti also stated several times that when he first started engaging with Lewis at Burns Avenue, he did not have his gun on his person and that he went back to his truck at some point during the encounter to get his firearm. A video of some or all of this interview was played for the jury.

On a subsequent recorded jail call with his father, Trifiletti, who had a permit to carry a firearm, stated he already had his gun on him when he first got out of his car at Burns Avenue; he did not return to his truck to get it. Trifiletti repeated at trial that he had his gun in his waistband from the beginning of the incident. Trifiletti further testified at trial that Lewis approached him as he stood near the back of his truck and that he saw Lewis reach under his shirt and draw his hand "straight up" from his waistband. Trifiletti stated that he believed Lewis was "grabbing what I th[ought] would be a gun" and that Lewis was going to kill him. Trifiletti further testified that while still on the call with his father, he put his phone in his pocket, drew his gun, and fired six times. As previously noted, Trifiletti's father testified that during the second call, he heard Trifiletti say "this guy's going to shoot me" and subsequently heard gunshots. Trifiletti's friends did not see the shooting but did hear the gunshots.

5

An expert testifying on behalf of Trifiletti explained the inconsistencies between his initial statement to police and his statements during his jail-cell call and at trial as the result of an "adrenaline dump" impacting his memory. At trial, Trifiletti expressed that he felt "terrible" about shooting Lewis.

There were two other witnesses to the shooting. M.W. drove past the two vehicles at the time of the shooting, with her boyfriend, S.S., in the passenger seat. M.W. was driving about 25–30 miles per hour. Although it was dark, there were streetlights and porch lights providing illumination.

S.S. did not see the shooting itself. He heard what he thought were fireworks and observed two men between two parked vehicles. S.S. saw Lewis falling away and Trifiletti bending his knees with both hands on the gun.

M.W. testified that she saw two men talking. She then observed Trifiletti go to his vehicle, grab a gun, shut the vehicle door, and fire at Lewis. When the shots were fired, Lewis looked to be turning around to go back to his vehicle, although M.W.'s testimony on how much Lewis had turned changed during the course of her testimony.[2] According to M.W., Trifiletti fired three shots and Lewis fell to the ground. The medical examiner testified that all the shots hit Lewis in the front of his body, not in his back. M.W. acknowledged on cross-examination that because she was driving, she did not accurately observe the details of Trifiletti's appearance and that her statements about the incident were

---

[2] In various statements to the police prior to trial, M.W. alternatively stated that Lewis was walking or sprinting away from Trifiletti at the time of the shooting.

6

influenced by her conversations with others she had talked to at or near the scene after the shooting.

The State charged Trifiletti with second-degree intentional murder, Minn. Stat. § 609.19, subd. 1(1) (2022), and second-degree unintentional felony murder with a predicate felony of assault, Minn. Stat. § 609.19, subd. 2(1) (2022). The case proceeded to trial.

Trifiletti's first trial started on February 22, 2021. No one disputed that Trifiletti fired the shots. Trifiletti argued he did not intend to kill Lewis and that he was acting in self-defense. During the first trial, M.W. provided in-person testimony subject to cross-examination. She testified as described above. In its presentation to the jury, the State placed significant emphasis on evidence showing that Trifiletti returned to his car to get his gun before he shot Lewis. The jury deadlocked and the district court declared a mistrial on March 8.

The second trial started on April 5, 2021. The first day of trial testimony was April 12, 2021, and testimony continued until April 16, 2021. The State informed the court on April 12 that M.W. was potentially exposed to COVID-19 through contact with her sister on April 6, 2021, but M.W.'s symptoms had already subsided and it was not confirmed that her sister had actually tested positive for COVID-19. Based on reports from the prosecutor (and not from M.W. directly), the district court noted that M.W. said a doctor told her she did not need to take a COVID-19 test.

On April 13, 2021, the district court explained it had contacted public health officials and that Dr. Lynne Ogawa, a doctor with Ramsey County Public Health,

7

"indicated that it would be reasonable--and reasonable was her word--for [M.W.] . . . to testify, as long as [she] remain[s] masked and [the court] enforce[s] the other public health protocols that [the court] had put into place during trial." The State informed the court that M.W. no longer had symptoms. The court decided M.W. was available to testify, though she would need to wear a mask, maintain social distance, and leave the courthouse immediately after testifying.

Later that day, the State informed the district court that M.W. reported her sister tested positive for COVID-19 and that M.W. was arranging to take a COVID-19 test. The court ruled that it was not "appropriate in light of the contact [M.W.] has had with her sister" for her to testify in person. According to the record, the district court never heard directly from M.W.

On the same day, April 13, Trifiletti's counsel provided a memorandum to the district court arguing that the Confrontation Clause did not allow M.W. to testify via video. The next day, April 14, M.W. informed the State (although not the district court directly) that she was going to take a COVID-19 test. The State said it would be "satisfied" as to M.W.'s availability if she tested negative and testified on a date outside of the necessary quarantine period. The State did not discuss the level of contact that occurred between M.W. and her sister or the length of the required quarantine period. The court requested that the State determine if M.W. had taken the COVID-19 test. While the record at no point confirms whether M.W. took a COVID-19 test, the record shows that the State did not report on whether M.W. completed the test or provided results.

The district court summarized the State's position and Trifiletti's objections to both having M.W. testify via remote testimony and having M.W.'s prior testimony read to the jury:

> THE COURT: And I just want to make sure that I'm clear, again, without arguing this out because we'll have an opportunity to do that, but just in terms of -- the State's position is that both [M.W.] and [S.S.] are unavailable, that plan A from the State's perspective would be to read their prior testimony under the hearsay exception in 804, that reading that prior testimony would not violate *Crawford* or Mr. Trifiletti's confrontation rights.
>
> MR. MURPHY: That's correct, Your Honor.
>
> THE COURT: And plan B from the State's perspective would be to have live remote testimony of both of those witnesses via Zoom, correct?
>
> MR. MURPHY: Yes, Judge.
>
> THE COURT: Okay. And, Mr. Shiah, I take it that the defense's contention will be that neither of those alternatives would be appropriate because Mr. Trifiletti's confrontation rights would be violated?
>
> MR. SHIAH: That's correct.

On that same day, April 14, the State called T.A., one of Trifiletti's friends who was on the scene, to testify. T.A. did not see the shooting but did have knowledge of events before and after the shooting. T.A. had tested positive for COVID-19 and was quarantining at the time of the trial. Trifiletti and the State had previously agreed to allow T.A. to testify remotely via Zoom, but ultimately T.A. testified in person because his quarantine period ended while the trial was still ongoing.

The next day, April 15, 2021, the State provided no additional updates or information on M.W. Despite the lack of updates about the status of M.W. or the results of her COVID-19 test, the court ultimately found that M.W. was unavailable to testify. The

9

district court referenced the parties' prior agreement to allow T.A. to give remote testimony when it explained why it would allow M.W. to testify either remotely or have a readout of her prior testimony:

> THE COURT: . . . [T.A.], another witness in this case, *who had a positive test for COVID*, was symptomatic and was required to quarantine. The issue for [T.A.] was what to do about him in light of those factors. An issue was presented to this Court, and after consulting with counsel and providing an opportunity to present [T.A.'s] live testimony remotely and after receiving the consent from counsel for both sides, the Court allowed his testimony to be presented by Zoom. The need for that was obviated by [T.A.'s] coming out of his quarantine [so T.A. testified in person].

(Emphasis added.) The district court provided Trifiletti with the following choice:

> THE COURT: . . . And I -- you know, the idea here is to tell you that I think that either alternative is acceptable. I'm not the advocate here, and I want to put you into a position where you have the choice. And I think that, out of fairness here, that given the fact that the State advocated for either/or and that the defense has objected to both, that the fairest thing -- and I'm not at all trying to put you in a difficult position; I'm trying to actually give you a meaningful choice -- is to allow the defense, if it chooses, to proceed in one way or the other.
>
> MR. SHIAH: And the other option is to request a continuance.
>
> THE COURT: That is another option.

Defense counsel then asked the district court the following:

> MR. SHIAH: I have just two questions before we adjourn. Number one, and I know this is somewhat of a request for an advisory opinion, but I assume if I move for a continuance, that will be denied, based on the Court's ruling, just in terms of explaining options to my client.
>
> THE COURT: My inclination would not be to continue the trial.

The district court then recessed for 1 hour and 55 minutes.

10

After recess, Trifiletti's counsel confirmed he was able to discuss the options with his client, and that Trifiletti chose to have M.W.'s prior testimony read aloud for the jury. Trifiletti did not move for a continuance. M.W.'s testimony from the first trial was read into the record.

The jury found Trifiletti not guilty of second-degree intentional murder, but guilty of second-degree felony murder and the lesser-included offense of second-degree manslaughter, Minn. Stat. § 609.205(1) (2022).[3] Trifiletti appealed. The court of appeals, with one judge dissenting, reversed Trifiletti's conviction. It decided that potential exposure to a contagion did not make the witness unavailable for purposes of the Confrontation Clause and that the error in allowing M.W. to testify was not harmless beyond a reasonable doubt. *State v. Trifiletti*, 980 N.W.2d 357, 366 (Minn. App. 2022). We granted the State's petition for review.[4]

---

[3]  Although Trifiletti was not charged with second-degree manslaughter at the first trial, Trifiletti's counsel requested the jury be instructed on second-degree manslaughter. The district court granted this request. At the second trial, the district court again included a second-degree manslaughter instruction for the jury.

[4]  Following oral argument, the State and Trifiletti filed letters citing supplemental authority. Trifiletti provided supplemental case law authority on questions that Trifiletti claims were asked by the court at oral argument: (1) "[w]hether the State can raise an invited-error argument for the first time at oral argument" and (2) "[w]hether a prosecutor's statements can be considered as evidence to establish an exception to a constitutional right." Trifiletti also provided the court with a citation to the transcript which addresses the question of "[w]hether the evidence presented and the State's theory of guilt at respondent's first trial was similar to the evidence presented and the State's theory of guilt at respondent's second trial."

The State filed a motion to strike the letter submitting supplemental authority. The State asserts that we did not ask the two questions for which Trifiletti submitted supplemental case law authority. We have reviewed the recording of oral argument and

**ANALYSIS**

The question before us is whether the district court's determination that M.W. was unavailable and its decision to allow the State to read the transcript of M.W.'s testimony from the first trial to the jury instead of requiring M.W. to testify in person at the second trial violated Trifiletti's constitutional right to confrontation. We review de novo the question of whether the admission of evidence violates the Confrontation Clause. *State v. Caulfield*, 722 N.W.2d 304, 308 (Minn. 2006). First, we determine whether the district court violated the Confrontation Clause. Then we evaluate issues of invited and harmless error.

---

conclude that we did ask questions about those two issues. We deny the State's motion to strike the letter of supplemental authority as to those points. But we grant the State's motion as to the citation to the transcript. *See* Minn. R. Civ. App. P. 128.05 (authorizing parties to file "pertinent and significant *authorities* [that] come to a party's attention after the party's brief has been filed and after oral argument but before decision" (emphasis added)). Nonetheless, we have thoroughly reviewed the transcript in this matter.

The State filed a letter of supplemental authority providing citation to a case addressing the question of "whether the four-part plain-error test applies to invited error." Trifiletti moved to strike the letter of supplemental authority on the ground that the State forfeited its invited-error argument by not raising it in its briefs to the court. We generally do not consider new arguments made at oral argument. *State v. Thompson*, 886 N.W.2d 224, 234 n.8 (Minn. 2016). But based on our resolution of the case—including our conclusion that the invited-error doctrine does not prohibit Trifiletti from challenging the district court's decision that one of the State's witnesses was not available to testify under the Confrontation Clause of the Sixth Amendment to the United States Constitution and Article I, Section 6, of the Minnesota Constitution, *see infra* Part II—and in the interest of fully addressing the issues presented, we see no need to strike the State's citation to supplemental authority.

12

# I.

## A.

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. Article I, Section 6, of the Minnesota Constitution contains nearly identical language: "The accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." Minn. Const. art. I, § 6. Accordingly, the Confrontation Clause generally "guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988).

The United States Supreme Court has described several reasons why physical face-to-face confrontation is so important. "[T]here is something deep in human nature that regards face-to-face confrontation between accused and accuser as 'essential to a fair trial in a criminal prosecution.' " *Id.* at 1017 (quoting *Pointer v. Texas*, 380 U.S. 400, 404 (1965)). It gives the accused:

> [A]n opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Maryland v. Craig*, 497 U.S. 836, 845 (1990) (quoting *Mattox v. United States*, 156 U.S. 237, 242–43 (1895)). Further, requiring a witness to look a defendant in the eye when testifying is important because "[i]t is always more difficult to tell a lie about a person 'to his face' than 'behind his back.' " *Coy*, 487 U.S. at 1019.

The Supreme Court, however, has also recognized narrow exceptions to the general constitutional requirement that a witness testify at trial in person under oath and subject to cross-examination. In *Crawford v. Washington*, 541 U.S. 36, 54 (2004), the Supreme Court held that when giving testimonial evidence,[5] a person must testify while physically in the courtroom "unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."

In *Maryland v. Craig*, a case that pre-dates *Crawford*, the Supreme Court held that "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." 497 U.S. at 850. The *Craig* Court reasoned that "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Id.* at 845. In *State v. Tate*, we explained that under the *Craig* test reliability may be shown and "[p]hysical presence may be excused . . . if the court preserves 'all of the other elements of the confrontation right: . . . . oath, cross-examination, and observation of the witness' demeanor.'" 985 N.W.2d 291, 304 (Minn. 2023) (third alteration in original) (quoting *Craig*, 497 U.S. at 851).

*Craig* does not apply in this case. M.W.'s testimony was presented to the jury by reading the transcript of her testimony from the first trial to the jury. That testimony was

---

[5] The parties do not dispute that M.W.'s testimony in this case was testimonial under the Confrontation Clause and we agree.

given under oath and subject to cross-examination. But reading a transcript into the record did not allow the jury to observe M.W.'s demeanor. Consequently, the *Craig-Tate* test for reliability was not satisfied. The district court's decision to allow M.W. to testify without being physically present in the courtroom cannot be justified under *Craig-Tate*.

Therefore, we turn our attention to whether the district court's decision to allow M.W. to testify without being physically present in the courtroom was justified under *Crawford*. Once again, under *Crawford*, a person must testify while physically in the courtroom "unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. at 54. In this case, Trifiletti had an opportunity to cross-examine M.W. at the first trial that resulted in a hung jury—the transcript read to the jury in the second trial included that cross-examination. Therefore, the only question before us is whether M.W. was unavailable for the second trial.

The State argues that the necessity prong of the *Craig* standard is the proper method for assessing whether a witness is unavailable; that unavailability under *Crawford* and necessity under *Craig* are synonymous and coextensive. We disagree.

Although *Crawford* did not expressly address the question of whether the witness in that case was "unavailable" for purposes of the Confrontation Clause, the Supreme Court stated that "[t]he text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts," *Crawford*, 541 U.S. at 54, and that "the 'right . . . to be confronted with the witnesses against him,' Amdt. 6, is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding." *Id.* (alteration in original)

15

(citing *Mattox*, 156 U.S. at 243). And the Supreme Court further stated that "the common law in 1791 conditioned admissibility of an absent witness's examination on unavailability and a prior opportunity to cross-examine." *Id.*

In 1791, the common law recognized several reasons that would render a witness unavailable so as to justify setting aside the confrontation right. For instance, in *West v. Louisiana*, the United States Supreme Court identified that,

> [a]t common law, the right existed to read a deposition upon the trial of the defendant, if such deposition had been taken when the defendant was present and when the defendant's counsel had had an opportunity to cross-examine, upon proof being made to the satisfaction of the court that the witness was at the time of the trial dead, insane, too ill ever to be expected to attend the trial, or kept away by the connivance of the defendant.

194 U.S. 258, 262 (1904), *overruled on other grounds by Pointer*, 380 U.S. at 406.

More recently, in *Giles v. California*, the Supreme Court reaffirmed its *Crawford* holding that the Confrontation Clause "admit[s] only those exceptions established at the time of the founding," and explained two such exceptions that existed at common law. 554 U.S. 353, 358 (2008) (internal quotation marks omitted) (quoting *Crawford*, 541 U.S. at 54). "The first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying." *Id.* "A second common-law doctrine, which [the Court] . . . refer[red] to as forfeiture by wrongdoing, permitted the introduction of statements of a witness who was 'detained' or 'kept away' by the 'means or procurement'

16

of the defendant." *Id.* at 359. Other conditions qualifying as unavailable may have existed under the common law in 1791 as well.[6]

The point here is not to fully resolve which conditions were recognized in 1791 and which were not. Rather, the key import of *Crawford* and its progeny for our current purposes is that a broad and undefined necessity-to-serve-an-important-public-interest was not a recognized exception under the common law in 1791. The concept of "necessity" in *Craig* is not the same as "unavailability" under *Crawford*.

On the other hand, we held in *Tate* that, even after *Crawford*, *Craig* remains good law to resolve the issue presented in that case—assessing whether a defendant's right to confrontation was violated when a district court allowed a witness exposed to COVID-19 to testify live but via two-way video. 985 N.W.2d at 300. We explained:

> *Crawford* does not undermine the holding of *Craig* because the cases address different Confrontation Clause issues. *Crawford* discussed whether the Confrontation Clause is violated by the admission at trial of a testimonial out-of-court statement. Before such a hearsay statement is admissible, *Crawford* held that the witness must be unavailable and the defendant must have had a prior opportunity for cross-examination. *Crawford* simply did not address the face-to-face aspect of confrontation and whether other key elements of confrontation, including full, virtual cross-examination, can satisfy a defendant's right to confrontation under certain narrow circumstances.

*Id.* (citations omitted). In other words, there are four constitutional indicia of reliability: the witness is physically face-to-face with the defendant, subject to full cross-examination,

---

[6]    The State and amicus Minnesota County Attorneys Association argue based on historical documents that a person who cannot travel or is under quarantine for exposure to a communicable disease would have been regarded as "unavailable" under the common law in 1791. Based on how we resolve this case, we do not reach that question.

under oath, with the opportunity for the jury to assess credibility. In *Tate*, we held that the *Craig* necessity/reliability test remains good law under circumstances where just one of those constitutional indicia of reliability—specifically, that the witness is physically face-to-face with the defendant—is absent. But where, in addition to the lack of face-to-face interaction with the defendant, one or more of the other constitutional indicia of reliability are not present, the *Craig* necessity/reliability test does not apply.

To maintain our consistency with *Crawford*, *Craig* and *Tate* are best read not as cases setting forth circumstances where an unavailable witness may nonetheless testify, but rather as cases holding that, when dictated by necessity, a witness is available for Confrontation Clause purposes where the witness is not physically in the courtroom but nonetheless appears live, subject to full, virtual cross-examination, under oath and under circumstances where the jury may effectively assess the witness's credibility directly. *Craig*, 497 U.S. at 857 (addressing a situation where a child sexual assault victim testified by one-way video feed from outside the courtroom); *Tate*, 985 N.W.2d at 299 (stating that "[t]he rationale set forth in *Craig* applies to witness testimony, whether by a child or an adult, taken by use of live, two-way, remote video technology like the type used here").[7]

---

[7] This conclusion is consistent with the position taken by the Eighth Circuit in *United States v. Bordeaux*, 400 F.3d 548 (8th Cir. 2005), a post-*Crawford* case. There, the court discussed its prior decision in *United States v. Rouse*, 111 F.3d 561, 568–70 (8th Cir. 1997), in which it "decided that the child witnesses who had testified via a two-way closed-circuit television had confronted the defendants as required by the Constitution." *Bordeaux*, 400 F.3d at 556. As the court explained, "[a] corollary to this, of course, is that the witnesses appeared at the trial." *Id.* Simply put, if a live virtual appearance is proper under *Craig*, then the witness appeared for purposes of *Crawford*; if the live virtual appearance

We emphasize that the necessity prong of the *Craig* test is an important limitation on the circumstances when a witness is deemed available under the Confrontation Clause under *Craig* and *Tate*; we will only do away with the requirement that the witness be physically present and in person when necessary to serve an important public purpose. The exception is narrow. Under those limited circumstances, we need not reach the question of unavailability discussed in *Crawford*.[8]

As noted above, however, this case is not *Craig* or *Tate*. In this case, the jury did not get a chance to directly assess the credibility of M.W. Therefore, the question is not

---

was not proper under *Craig*, then the witness did not appear at trial and was also not unavailable under *Crawford*.

[8] We acknowledge that a focus on reliability is in some tension with *Crawford*'s direct rejection of *Ohio v. Roberts*, 448 U.S. 56 (1980). *Crawford*, 541 U.S. at 60–62. In *Roberts*, the Court decided that admission of a hearsay statement did not violate the Confrontation Clause when a declarant was unavailable to testify if the statement contained "adequate indicia of reliability." *Roberts*, 448 U.S. at 66 (internal quotation marks omitted). In *Tate*, however, we rejected the argument that *Crawford* overruled *Craig* (at least under the circumstances presented in *Tate*). 985 N.W.2d at 300. We reasoned:

> [O]nly the Supreme Court may overrule one of its own decisions. *State v. Brist*, 812 N.W.2d 51, 56 (Minn. 2012) (holding that a Supreme Court decision casting doubt on a previous opinion's reasoning is different from overruling the prior opinion's holding). Even acknowledging that *Crawford* casts some doubt on the reasoning underlying the reliability prong of the *Craig* test, we note that *Crawford* did not overrule *Craig*. In fact, the majority in *Crawford* does not mention *Craig* in its analysis. Because the Supreme Court has not exercised its exclusive prerogative of overruling its own decision, it follows that *Craig*, in its entirety, remains good law.

*Id.* Our holding today reconciles the *Crawford* Court's rejection of the idea that a witness is unavailable to testify as long as the witness' statement contained adequate indicia of reliability and our holding in *Tate* that *Crawford* did not overrule *Craig* in the context of a witness who testifies live via two-way video. We also observe that other constitutional protections like the right to public trial are assessed under an altogether different test. *See, e.g.*, *State v. Bell*, 993 N.W.2d 418 (Minn. 2023).

19

whether the necessity and reliability prongs were satisfied; we must instead address whether M.W. was unavailable—not able to appear live to testify in court—for purposes of the Confrontation Clause. Only if M.W. were unavailable for the second trial could the transcript of M.W.'s testimonial statements from the first trial—for which Trifiletti had the opportunity for cross-examination—be admitted.

B.

The burden to prove that M.W. was unavailable falls squarely on the State's shoulders. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009) ("[T]he Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court.").

The parties urge us to resolve the question of unavailability by engaging in a nuanced historical assessment of whether a witness who is not ill but has been exposed to a person with a contagious communicable disease would have been deemed unavailable in 1791 when the Confrontation Clause was adopted. We decline that invitation because we resolve this case on different grounds.

"A witness is not 'unavailable' for Confrontation Clause purposes 'unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial.' " *State v. Cox*, 779 N.W.2d 844, 852 (Minn. 2010) (quoting *Barber v. Page*, 390 U.S. 719, 724–25 (1968)). To satisfy the requirement of a good-faith effort, the prosecution need not "exhaust every avenue of inquiry, no matter how unpromising." *Hardy v. Cross*, 565 U.S. 65, 71–72 (2011). The prosecution must, however, exhaust some avenues. For example, in *Barber*, the United States Supreme Court concluded the state prosecutors failed to satisfy

20

the requirement of a good-faith effort when they simply notified the district court that the witness was serving a sentence in a federal prison. 390 U.S. at 723–24. The Court explained that the prosecutors could have sought to secure the presence of the witness at trial under a writ of habeas corpus ad testificandum issued by a state or federal court and stated that the state prosecutors "made no effort to avail themselves of either . . . means of seeking to secure [the witness's] presence at petitioner's trial." *Id.* at 724. And in *Cox*, we concluded "the State failed to establish by a preponderance of the evidence that [the witness] was unavailable to testify at Cox's trial for purposes of the Confrontation Clause" because the State never established that the reluctant witness "would refuse to testify if she were called as a witness." 779 N.W.2d at 852.

We hold that a witness's unavailability under the Confrontation Clause cannot be judged at a single point in time. Rather, in assessing whether an individual is unavailable, a district court should consider not only whether the witness is unavailable on the day that the State desires to call the witness, but also whether the witness will be unavailable at any reasonable point in time during the trial when witness testimony may be heard.[9] In this case, M.W. had contact with her sister on April 6, 2021. Her sister later tested positive for COVID-19. The record does not reflect that M.W. ever tested positive for COVID-19. And her doctor advised her she did not need to take a test.

---

[9] Based on our resolution of this case, we do not address the separate question of the circumstance under which continuance of a trial is required to remedy a witness's inability to physically appear in person under *Crawford*.

M.W. never personally described her circumstances to the district court; it was all presented indirectly by the prosecutor. The State told the district court about M.W.'s COVID-19 exposure on April 12. At that time, M.W. reported no symptoms related to COVID-19. But the State did not discuss the level of contact between M.W. and her sister and did not address the length of the required quarantine period. And the State also failed to follow through on the court's request that the State determine if M.W. had taken a COVID-19 test; the record is silent on whether the State made any report to the court on that issue.

On April 13, the district court initially decided that M.W. could appear for trial based upon the express recommendation of Ramsey County public health officials. Later, the district court changed its mind and ruled that M.W. could not appear due to quarantine requirements, and she was therefore unavailable for purposes of the Confrontation Clause.

In support of its decision, the district court reviewed the quarantine policy found on the Minnesota Department of Health website. *Updated COVID-19 Quarantine Guidance*, Minn. Dep't of Health (Dec. 7, 2020, 3:00 PM), https://content.govdelivery.com/accounts /MNMDH/bulletins/2b002eb [opinion attachment]. According to those guidelines, a person "should stay away from others for 14 days" if someone in the person's home had COVID-19 or the person lived in a building "where it is hard to stay away from others and easy to spread the virus to multiple people, like a long-term care facility." Neither of those criteria applied to M.W. The guidelines allowed a person to be around others after 10 days—here April 16—if the person has no symptoms and had not tested positive for COVID-19. M.W. had no symptoms by the time her exposure was reported to the court

22

and there is no indication that she had tested positive for COVID-19. The guidelines further advised that a person should continue to watch for symptoms, continue to wear a mask, and stay 6 feet away from other people. The court was already enforcing public health protocols in response to the pandemic: a requirement for all in the courtroom to wear masks unless speaking and plexiglass around the witness box to isolate the witness while testifying. Additionally, the witness box in the courtroom kept all witnesses—indeed, everyone in the courtroom—more than 6 feet from others.

Based on a review of the guidelines, the district court determined that the 14-day quarantine period applied to M.W. In making its decision, the district court never expressly considered whether applying a 10-day quarantine recommendation instead—the conditions of which M.W. met—would have allowed M.W. to testify in person. Nor did the State make any good faith effort to secure M.W.'s in-person testimony under the 10-day quarantine recommendation. In light of the important constitutional confrontation right at stake and the State's failure to exhaust reasonable avenues, the district court's decision was in error. *See Melendez-Diaz*, 557 U.S. at 325 (rejecting prosecutor's argument that the confrontation right should be relaxed and observing that "[t]he Confrontation Clause may make the prosecution of criminals more burdensome, but that is equally true of the right to trial by jury and the privilege against self-incrimination. The Confrontation Clause—like those other constitutional provisions—is binding, and we may not disregard it at our convenience"). M.W. could have appeared in person on April 16. The Ramsey County public health doctor directly told the district court that M.W. could appear. M.W. was not unavailable for Confrontation Clause purposes on April 16. And because the trial

23

testimony continued until April 16, M.W. was constitutionally available to testify in person at trial; allowing her to testify in person would not have delayed the conclusion of the trial.[10]

## II.

The State argues that, even if the district court decision to allow M.W. to testify even though she was not physically present in the courtroom violated the Confrontation Clause, we should overlook the error because Trifiletti invited the error. The State points out that when Trifiletti was offered binary options by the district court—neither of which he found acceptable—Trifiletti chose to have M.W.'s testimony from the first trial read into the record rather than having M.W. appear via two-way video. While we acknowledge that "[t]he right to confrontation may . . . be waived, including by failure to object to the offending evidence; and States may adopt procedural rules governing the exercise of such objections," *Melendez-Diaz*, 557 U.S. at 314 n.3, we conclude under these circumstances

---

[10]  This case differs factually from *Tate* for these reasons as well. In *Tate*, we faced the question of whether the district court was required to grant a continuance of the trial before determining that a witness could testify remotely rather than in person. 985 N.W.2d at 303. The witness had been exposed to COVID-19 4 days before the trial was to begin and (unlike this case) was advised by public health officials to quarantine. *Id.* at 295. At the time of the *Tate* trial, the guidance provided by the Minnesota Department of Health and the Centers for Disease Control and Prevention recommended a 14-day quarantine in all cases of exposure; there was no 10-day quarantine guidance. *Id.* More critically, the record showed that the trial would end before the quarantine period ended. *See id.* at 295–96. In other words, the district court had no option (as it did here) to allow the witness to testify at some point during the trial; a continuance of the entire trial was the only option. We held that "the possibility of a continuance does not necessarily undercut a showing of necessity." *Id.* at 303. We did not directly address the question of whether the possibility of rearranging the order of witness testimony undercut a showing of necessity. *See id.*

that the invited-error doctrine does not prevent Trifiletti from challenging the district court's decision that M.W. was unavailable under the Confrontation Clause.

The concept of "invited error" has existed in Minnesota jurisprudence for over a century. *See, e.g.*, *McAlpine v. Fid. & Cas. Co. of N.Y.*, 158 N.W. 967, 970 (Minn. 1916). We have recognized that the doctrine of invited error prevents a party from challenging on appeal a district court decision to which the party consented or affirmatively requested. *See State v. Weigold*, 160 N.W.2d 577, 579–80 (Minn. 1968) (holding that a defendant who affirmatively consented on the record to closing a public trial by stating "I have no objection to this" could not challenge the closure on appeal); *Majerus v. Guelsow*, 113 N.W.2d 450, 457 (Minn. 1962) (citing that the "settled general rule is that a party cannot avail himself of invited error" and holding that a party who successfully persuaded the district court to change the answers to three jury interrogatories because the answers were contrary to the evidence could not on appeal challenge that decision as improper because the party was estopped from making the argument (quoting *McAlpine*, 158 N.W. at 970)).[11]  That is not the case here.

---

[11]  We have also in some cases (although not all) referred to a party's passive failure to take action to prevent a district court's erroneous action—like failing to object—as a species of invited error. *See, e.g.*, *State v. Goelz*, 743 N.W.2d 249, 258 (Minn. 2007) (stating that "[t]he invited error doctrine prevents a party from asserting an error on appeal that he invited *or* could have prevented in the court below" (emphasis added)); *see also State v. Carridine*, 812 N.W.2d 130, 142 (Minn. 2012) (stating that "[u]nder the invited error doctrine, a party cannot assert on appeal an error that he invited or that could have been prevented at the district court"). As explained below, Trifiletti did not act passively in this case, but instead plainly objected to the district court's decision to allow M.W. to testify without requiring that she be physically present and in person in the courtroom.

25

Trifiletti plainly objected and demanded under the Confrontation Clause that M.W. appear to testify in person in the courtroom. It was only after the district court decided that M.W. was unavailable for Confrontation Clause purposes and did not have to appear physically in person in the courtroom that Trifiletti was put to the choice between the two alternatives of having the cold transcript of M.W.'s testimony at the first trial read to the jury or M.W. appearing via video. Thus, our focus for purposes of the invited-error doctrine in this case is on the district court's preliminary decision that M.W. was constitutionally unavailable. Trifiletti did not consent to the district court's decision and, indeed, never accepted the decision was correct and took affirmative steps to convince the district court to reach a different decision.

We are also not persuaded that it makes a difference for purposes of invited error that, once faced with the choice between a cold read of M.W.'s testimony at the first trial (an option that was unconstitutional under the Confrontation Clause) and two-way video (an option that may have been constitutional applying *Tate* to the facts of this case—a question we need not resolve), he chose to have the cold transcript read. Trifiletti did not affirmatively suggest to the district court that the transcript of M.W.'s testimony from the first trial should be read to the jury; it was the district court who suggested that option to Trifiletti. Further, he made that choice under protest against having to make any choice whatsoever.

III.

Having concluded that the district court erred in determining that M.W. was unavailable under the Confrontation Clause, we turn to the question of whether Trifiletti is

26

entitled to a new trial. Because the error here is a violation of Trifiletti's constitutional rights, Trifiletti is entitled to a new trial unless the error was harmless beyond a reasonable doubt. *See State v. Juarez*, 572 N.W.2d 286, 291 (Minn. 1997); *Caulfield*, 722 N.W.2d at 314; *see also Chapman v. California*, 386 U.S. 18, 24 (1967) (stating that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"). Our harmless-error doctrine reflects the fact that "[m]ost constitutional errors can be harmless." *State v. Finnegan*, 784 N.W.2d 243, 259–60 (Minn. 2010) (internal quotation marks omitted) (quoting *Neder v. United States*, 527 U.S. 1, 8 (1999)). To be harmless beyond a reasonable doubt, the jury's decision must be "surely unattributable" to the error. *Juarez*, 572 N.W.2d at 292.[12]

In making that determination, we consider several non-exclusive factors. For instance, if the wrongly admitted evidence "was presented in a manner that did not give it significant focus," it is less likely that the jury's guilty verdict was attributable to the admission of the evidence. *Caulfield*, 722 N.W.2d at 317. Similarly, if "the State did not dwell on [the erroneously admitted evidence] in opening and closing statements or in examining witnesses," it is less likely that the evidence affected the verdict. *Id.* The fact that the wrongly admitted evidence was "not highly persuasive but was circumstantial"

---

[12]    The State argues that we should grant a new trial only where the jury would have decided Trifiletti was not guilty (or reached a hung verdict) "but-for" the district court's decision to allow M.W.'s testimony to be presented through a cold read of the transcript rather than having M.W. testify in person while physically in the courtroom. We are not clear as to whether the State is articulating a different standard for constitutional harmless error than we have applied for several decades. If it is, we decline the invitation to change years of precedent in how we articulate the harmless-error test for constitutional errors.

also points to a lower likelihood that the jury's guilty verdict was attributable to the error. *Id.* But, of course, the converse is also true: if the evidence was presented in a manner that gave it significant focus, if the State focused on the evidence in opening and closing statements or in examining witnesses, or if the evidence was highly persuasive, there is a greater possibility that the jury's guilty verdict was attributable to the error.

We also consider the strength of evidence of the defendant's guilt in assessing whether a constitutional error is harmless. *Id.* But the strength of evidence of guilt only reinforces a harmless-error conclusion; even strong evidence of guilt is insufficient to find an error harmless beyond a reasonable doubt if other factors point in the direction of a conclusion that the error was harmful. *Id.*

Applying this test, we conclude that the district court's admission in the second trial of the 15-page transcript of M.W.'s sworn testimony from the first trial, which was subject to cross-examination, was harmless beyond a reasonable doubt.

In this case, we start by focusing our attention on the issues that were contested at trial. It was uncontested that Trifiletti fired the shots at Lewis and Lewis died as a result of those shots. On the other hand, the parties disputed (1) whether Trifiletti intended to kill Lewis or intended to cause bodily harm to Lewis when he fired the shots, and (2) whether Trifiletti was acting in self-defense when he fired the shots at Lewis.

The jury acquitted Trifiletti of intentional murder. Accordingly, the question of whether Trifiletti intended to kill Lewis or cause bodily harm to Lewis is no longer at issue and is not before us on appeal.

We are left, then, with the question of whether Trifiletti was acting in self-defense when he killed Lewis. Self-defense is a defense to all three crimes of which Trifiletti could have been convicted—second-degree intentional murder, second-degree felony murder with a predicate felony of assault (harm), and second-degree manslaughter. Consequently, because the jury found Trifiletti guilty of two of those offenses, there is no question that the jury rejected Trifiletti's claim that he was acting in self-defense. Our harmless-error review accordingly focuses on whether the jury's decision that he was not acting in self-defense is surely unattributable to the district court's erroneous decision to allow M.W.'s prior testimony to be read into the record.

Under Minnesota law, the State had the burden to prove beyond a reasonable doubt that Trifiletti was not acting in self-defense. *State v. Johnson*, 719 N.W.2d 619, 629 (Minn. 2006) (explaining that, once the defendant has offered evidence of self-defense, the burden shifts to the State to disprove the defendant's self-defense claim). To do so, the State had to prove that at least one of following elements of a self-defense claim did not exist in this case:

> (1) the absence of aggression or provocation on the part of the defendant;
> (2) the defendant's actual and honest belief that he or she was in imminent danger of death or great bodily harm; (3) the existence of reasonable grounds for that belief; and (4) the absence of a reasonable possibility of retreat to avoid the danger.

*Id.* (quoting *State v. Basting*, 572 N.W.2d 281, 285 (Minn. 1997)). The State vigorously contested the existence of each of these factors with a variety of evidence. And the jury's verdict tells us that the jury believed that the State proved at least one of these factors did not exist beyond a reasonable doubt.

29

The evidence and arguments that the State made to disprove that Trifiletti was acting in self-defense fall into two buckets. First, the State introduced evidence to show that Trifiletti was the aggressor and provocateur after the parties exited Interstate 94 and parked on Burns Avenue, and that Trifiletti had ample opportunity to disengage from the confrontation and retreat (the first and fourth elements of self-defense). Second, the State introduced evidence to refute the idea that Trifiletti reasonably and actually believed he was in danger of death or great bodily harm (the second and third elements of self-defense).

We turn first to the evidence and arguments that Trifiletti was aggressive and provocative during the incident with Lewis and that Trifiletti had a reasonable chance to retreat to avoid the danger. The State presented the following evidence: After Lewis refused to turn over his insurance information as Trifiletti requested, Lewis got back into his car to leave—an act that would have ended the confrontation—but Trifiletti yelled "hey" at Lewis to stop Lewis from leaving. Trifiletti's friend confirmed these events at trial. And in Trifiletti's initial statement to the police, he stated that, at some point before the shooting, both he and Lewis got in their cars and started driving before subsequently stopping and exiting their cars. The State also emphasized photographic evidence that Lewis's car had moved between the time the parties first arrived at Burns Avenue and the time that Lewis was shot and that Lewis's car was still running after the shooting. In short, the State's main argument against self-defense at the second trial was that Trifiletti and Lewis both got in their cars and Trifiletti provoked further conflict by following Lewis even though he had the opportunity to drive away.

In addition to this testimony, the portion of Trifiletti's initial statement to police where Trifiletti told the police that, at some point during the incident, he went back to his truck to retrieve his gun also supports the conclusion that Trifiletti was the aggressor. Notably, however, the State did not focus on this fact at the second trial.[13] For instance, after the video of the initial interview was played to the jury, the prosecutor mentioned Trifiletti's statements that he went back to his truck to get his gun only once—and even then, the prosecutor mentioned those statements to attack Trifiletti's credibility, arguing that Trifiletti lied in his first statement "because [he] thought it would sound better" not to have the gun on him all along. The prosecutor never cross-examined Trifiletti about his claims in the initial statement that he returned to his truck to get his gun. Finally, in his closing argument, the prosecutor only replayed portions of the video of the interview and each time emphasized Trifiletti's statements that he and Lewis both got in their vehicles and drove a short distance; the prosecutor never mentioned or focused on Trifiletti returning to his car to get his gun when replaying Trifiletti's initial statement during closing.

Trifiletti offered evidence to refute the State's narrative that Trifiletti was the aggressor and had a chance to disengage and leave. For instance, Trifiletti testified that Lewis was the ultimate aggressor who came at him. This testimony was supported by Trifiletti's father who testified that Trifiletti told him on the phone, "[T]his guy's going to shoot me . . . . [T]his guy's going to kill me," immediately before shots were fired. Further,

---

[13]     In contrast, at the first trial, the State placed more emphasis in its argument to the jury on evidence showing that Trifiletti went back to retrieve his gun.

31

in his description at trial of the events leading up to the shooting, Trifiletti never affirmatively acknowledged that he got in his truck at any time. He also expressly and specifically denied that he returned to his truck to get his gun. Notably, however, Trifiletti during his testimony never expressly stated that he did not return to his truck at any point over the course of the incident and never expressly rejected the fact that there was a point in time before the shooting that he could have left the scene—two major focuses of the State's argument to the jury. Finally, Trifiletti observed that, even if the jury believed his initial statement to police that he did return to his truck during the incident, he explained to the police in that same initial statement that he did not leave because he thought Lewis would shoot him as he did so. In short, the State presented strong evidence that supports the conclusion that Trifiletti was the aggressor and that he had a chance to disengage from and leave the confrontation, but there is some evidence that supports an alternate conclusion.

With that background in mind, we turn to M.W.'s testimony with an eye to assessing how its admission may have affected how the jury viewed the question of whether Trifiletti was the aggressor or had the opportunity to disengage from the confrontation and retreat. M.W. offered two pieces of evidence. First, she testified that, after she saw Trifiletti and Lewis talking, she saw Trifiletti return to his truck, open the door, and "reach[] and grab[] something. He didn't climb in or anything, he just -- he reached in and grabbed his gun and shut the door" and then fired the gun at Lewis. Second, M.W. was the only witness who testified that when the shots were fired, Lewis was walking away—or at least starting to turn away.

32

M.W.'s testimony supported the State's case that Trifiletti was the aggressor and that he had a chance to retreat in a few ways. First, her testimony corroborated Trifiletti's statement that he returned to his truck to retrieve a gun at some point during the incident, although Trifiletti's statement is not as specific as M.W.'s about the timing of his retrieval of the gun. Second, the fact that M.W.'s testimony paralleled portions of the description of events that Trifiletti gave to the police during his initial statement may have encouraged the jury to believe other parts of Trifiletti's initial statement to the police—parts that M.W. did not directly corroborate. Third, if, as M.W. testified, Lewis was turning away when Trifiletti fired his shots, the jury would have more reason to conclude that Trifiletti was the aggressor or could have left the scene.

On the other hand, consideration of other factors tells us that the effect of M.W.'s testimony was not so substantial as to raise a reasonable doubt as to whether the jury would have reached the same verdict without the evidence. The most relevant, although far from decisive, part of M.W.'s testimony as it relates to whether Trifiletti was the aggressor and had a chance to avoid the confrontation was her direct testimony that Trifiletti returned to his truck to retrieve his gun. As discussed above, however, that fact was not a central part of the State's case to the jury. The State mentioned that fact only in passing, did not cross-examine Trifiletti on that fact, and did not mention it when it replayed Trifiletti's statement to the police during closing.

M.W.'s evolving testimony about what Lewis was doing when Trifiletti shot him, at best, provides slight and cumulative support for the State's position that Trifiletti was the aggressor. The testimony had no impact on the question of whether Trifiletti had a

chance to disengage and leave the confrontation before M.W. even arrived at the scene—the State's core argument that Trifiletti had the opportunity to retreat at trial.

Notably, the prosecutor did not reference this part of M.W.'s testimony during closing; a reticence that is understandable because Trifiletti countered the testimony. For instance, M.W. acknowledged that she changed her story multiple times over the course of several statements to the police, in addition to her trial testimony. She alternatively said she saw Lewis sprinting away when Trifiletti shot him, walking away when Trifiletti shot him, turned around when Trifiletti shot him, or starting to turn around when Trifiletti shot him. Further, any of these varying positions were contradicted by the testimony of the medical examiner, who testified that all of Trifiletti's shots hit Lewis in the front of his body and none entered from the back.

Finally, we do not find the possibility that M.W.'s testimony indirectly bolstered the other evidence that Trifiletti had a chance to retreat, standing on its own, sufficient to convince us that the jury's rejection of Trifiletti's self-defense claim was attributable to M.W.'s testimony. In particular, Trifiletti himself never expressly refuted the evidence that Lewis got in his car and started to drive away nor the assertion that at some point during the encounter Trifiletti was in his truck.

We now turn to the State's second set of arguments for rejecting Trifiletti's self-defense claim—evidence and arguments to refute the idea that Trifiletti reasonably and actually believed he was in danger of death or great bodily harm. The State's arguments here were less robust. The State noted that Lewis was unarmed and that Trifiletti and his three friends were of similar size to Lewis. Trifiletti countered through his own

testimony and that of his friends that Lewis made statements indicating he was a G.D. (which one of the friends understood to be a reference to gang affiliation) and also made gestures suggesting that he had a gun in his waistband. Trifiletti told his father that Lewis was going to shoot him and kill him. Further, at trial, Trifiletti testified that when Lewis approached just before Trifiletti fired his shots, Lewis reached into his shirt near his waistband and raised his arm; an action that Trifiletti thought meant Lewis was going to shoot him.

M.W.'s testimony that Lewis seemed to be turning away when Trifiletti shot him also tends to support the State's conclusion that—at that critical moment of pulling the trigger—Trifiletti did not reasonably fear death or great bodily injury. M.W.'s testimony on that point was inconsistent with the medical examiner's conclusion and repeatedly changed over the course of the investigation and was countered in cross-examination. Moreover, this testimony was not the focus of the State's case at the second trial. The State did not discuss M.W.'s testimony on this point in its closing argument.

More broadly, the State focused very little attention on M.W.'s testimony. Aside from S.S., no other witnesses were asked about M.W.'s version of events. In opening statements, the prosecutor mentioned M.W.'s testimony only in passing. In a closing that covers 41 pages of transcript, the prosecutor said the following about M.W. and nothing more:

> [M.W.] testified that she saw the shooting. . . . [M.W] testified that she saw two men on Burns as she was going slowly -- driving slowly down the street. She said she didn't want to hit any deer, so she was going slow. She saw those two guys up there, it looked like they were talking. She saw the white

guy turn around, go back to his truck, it looked like he was reaching inside, came out and shot the black man in the street.

In contrast, at the first trial, the State's closing argument mentioned M.W's testimony several times and committed to her version of events claiming that "the Defendant chose to turn around and go back to the truck."[14]

Viewing M.W.'s testimony in light of all these factors, we conclude that the jury's determination that Trifiletti did not act in self-defense was surely unattributable to M.W.'s testimony. Accordingly, the district court's error in admitting M.W.'s testimony was harmless beyond a reasonable doubt.

\*　　　\*　　　\*

We hold that the district court's decision that M.W. was unavailable under the Confrontation Clause was error. We further hold that Trifiletti did not invite the error. Finally, we hold that the error was harmless beyond a reasonable doubt.

---

[14] The prosecutor's decision to downplay M.W.'s testimony is understandable because M.W.'s testimony was simply not persuasive. We have already run through in detail M.W.'s evolving testimony on what Lewis was doing when he was shot. M.W. also stated or testified at varying times that Trifiletti ran back to his truck to get his gun or "fast-walked" back to his truck.

M.W. also made the claim at trial that she witnessed the episode for 3 minutes while simultaneously driving by at about 25–35 miles per hour without stopping. At the same time, she acknowledged that her description of Trifiletti to the police was inaccurate precisely because she was also driving a vehicle and was not really paying attention to details of Trifiletti's appearance. Moreover, M.W. admitted that her statements about the incident were influenced by her conversations with others she had talked to at or near the scene after the shooting. She testified on cross-examination, for instance, that "I didn't really see [Trifiletti and Lewis] arguing, but I know the neighbors said that they were arguing, so all I can picture is them possibly arguing, then walking back towards the pickup truck."

## CONCLUSION

We reverse the decision of the court of appeals.

Reversed.


PROCACCINI, J., took no part in the consideration or decision of this case.

DISSENT

ANDERSON, Justice (dissenting).

I agree with the court that it was error for the district court to hold that M.W. was unavailable under the Confrontation Clause, and I also agree that Trifiletti did not invite the error. And as to the standard that the State must meet to avoid a new trial here, I agree with the court's formulation of that standard, specifically, for the error to be harmless beyond a reasonable doubt, the jury's decision must be "surely unattributable" to the error. *State v. Juarez*, 572 N.W.2d 286, 292 (Minn. 1997).

Because I conclude that the record does not sufficiently support the claim by the State that the jury's decision was "surely unattributable" to the error, I dissent and would remand the case to the district court for a new trial.

The testimony from M.W. damaged the credibility of Trifiletti; as Trifiletti notes in his brief, the testimony from M.W. was more consistent with Trifiletti's original statement to police rather than his trial testimony, and that in turn supported the State's argument that Trifiletti was not credible. And as the respondent also notes, M.W. was the only witness who claimed to have seen the critical moments preceding the shooting along with the shooting itself.

I do not disagree with the court that reasons exist to doubt the credibility of M.W.; but, on this record, I cannot say the error was harmless beyond a reasonable doubt and thus, I would remand for a new trial.




# Updated COVID-19 Quarantine Guidance

Minnesota Department of Health sent this bulletin at 12/07/2020 03:00 PM CST



View this as a webpage

**Minnesota Department of Health**

*December 7, 2020*

## Updated Quarantine Guidance

For months, CDC had recommended a quarantine period of 14 days for people exposed to someone with COVID-19, also known as close contacts. Quarantine is one of several public health tools used to reduce the risk of spreading COVID-19 to others. This guidance was based on evidence showing that close contacts can develop a COVID-19 infection as many as 14 days after being exposed.

Last week, CDC announced an update to that long-standing guidance that includes options for 10-day or seven-day quarantines under certain conditions. After reviewing the available information, we updated our guidance to integrate these new recommendations.

### The safest option is to stay away from others for 14 days.

- In certain situations, you may end your quarantine after 10 days, or after seven days with a negative COVID-19 test result.
- **You cannot end your quarantine before seven days for any reason.**
- Some work settings, like health care, have different rules about quarantine. Check with your employer.

---

### You should stay away from others for 14 days if:

- Someone in your home has COVID-19.
- You live in a building with other people, where it's hard to stay away from others and easy to spread the virus to multiple people, like a long-term care facility.



---

### You may consider being around others after 10 days if:

- You do not have any symptoms.
- You have not had a positive test for COVID-19.
- No one in your home has COVID-19, and you do not live in a building with other people, where it's hard to stay away from others and easy to spread the virus to multiple people, like a long-term care facility.

**Even after 10 days you must still:**

- Watch for symptoms through day 14. If you have any symptoms, stay home, separate yourself from others, and get tested right away.
- Continue to wear a mask and stay at least 6 feet away from other people.



## You may consider being around others after seven days only if:

- You get tested for COVID-19 at least five full days after you had close contact with someone with COVID-19, and the test is negative.
- You do not have any symptoms.
- You have not had a positive test for COVID-19.
- No one in your home has COVID-19, and you do not live in a building with other people, where it's hard to stay away from others and easy to spread the virus to multiple people, like a long-term care facility.

**Even after seven days you must still:**

- Watch for symptoms through day 14. If you have any symptoms, stay home, separate yourself from others, and get tested right away.
- Continue to wear a mask and stay at least 6 feet away from other people.



**You cannot end your quarantine before seven days for any reason.**

## More information

- Close Contacts and Tracing: COVID-19
  We are working to update other areas of the website, documents, and other materials as quickly as possible.
- Read the news release: State health officials issue updated guidance for COVID-19 quarantines
- Download the free COVIDaware MN app to get notified if you have been near someone who tests positive for COVID-19.
- CDC: When to Quarantine

**The situation is changing rapidly. Visit Coronavirus Disease 2019 (COVID-19) for the most up-to-date information and follow MDH on Facebook, Twitter, & Instagram to stay informed.**

## Minnesota Helpline

For questions related to the COVID-19 pandemic

651-297-1304 or 1-800-657-3504

Monday-Friday: 9 a.m. to 4 p.m.



Minnesota Department of Health | health.mn.gov

Manage Preferences | Unsubscribe | Help

You can update or cancel your subscription at any time by editing your personal profile. All you will need are your email address and your password (if you have selected one).

P.S. If you have any questions or problems please contact subscriberhelp.govdelivery.com for assistance.

 
